No. 3-09-0120

_____

Filed August 24, 2010 Corrected

IN THE


APPELLATE COURT OF ILLINOIS


THIRD DISTRICT


A.D., 2010


| | | |
|---|---|---|
| SIERRA CLUB and PEORIA FAMILIES | ) | Petition for Review of |
| AGAINST TOXIC WASTE, | ) | Opinion and Order of the |
| | ) | Illinois Pollution Control |
| Petitioners-Appellants, | ) | Board |
| | ) | |
| v. | ) | |
| | ) | |
| ILLINOIS POLLUTION CONTROL | ) | |
| BOARD, PEORIA DISPOSAL COMPANY, | ) | No. AS 08-10 |
| ILLINOIS ENVIRONMENTAL | ) | |
| PROTECTION AGENCY, | ) | |
| | ) | |
| Respondents-Appellees, | ) | |

```
                              )

     and                      )

                              )

UNITED STATES ENVIRONMENTAL   )

PROTECTION AGENCY,            )

                              )

     Respondents.            )
```
_____


JUSTICE LYTTON delivered the opinion of the court:

_____


Peoria Disposal Company (PDC) filed a petition with the Illinois Pollution Control Board (Board) to delist residue resulting from the treatment of electric arc furnace dust (EAFD) as a hazardous waste for disposal purposes. The Board issued an order granting PDC's petition. Sierra Club and Peoria Families Against Toxic Waste (collectively referred to as the opposition groups) seek reversal of the Board's order, arguing that the Board erred in (1) failing to consider the factors set forth in section 27(a) of the Illinois Environmental Protection Act (Act) (415 ILCS 5/27(a) (West 2008)); (2) not requiring PDC to address future permit modifications; (3) finding that local citing approval was

2

not required; and (4) not requiring reopener language. PDC and the Board argue that the opposition groups do not have standing to appeal the Board's order. We find that the opposition groups have standing but affirm the Board's order on the merits of the case.

BACKGROUND

In 1989, the Illinois Environmental Protection Agency (IEPA) issued a permit to PDC to operate a waste stabilization facility (WSF) near Peoria, Illinois, for the storage and treatment of hazardous and nonhazardous waste. On April 25, 2008, PDC filed a delisting adjusted standard petition under section 28.1 of the Act (415 ILCS 5/28.1 (West 2008)). In the petition, PDC asked the Board to delist K061 hazardous waste, EAFD, an emission from the production of steel in electric arc furnaces, after the EAFD is treated and stabilized. The residue resulting from PDC's treatment is referred to as "electric arc furnace dust stabilized residue" (EAFDSR).

On June 12, 2008, IEPA filed a response generally supporting the petition. The Board conducted a public hearing on PDC's petition on August 18, 2008. PDC presented two witnesses at the hearing. PDC's first witness was Laura Curtis, a senior environmental engineer for RMT, Inc., an environmental energy and engineering firm that provides consulting services to businesses like PDC. PDC retained her to evaluate the new process it

3

developed for stabilizing EAFD waste. She summarized the delisting process. She also testified about the chemical process involved in stabilizing EAFD waste and the tests she performed to determine if PDC's process successfully removed the hazardous properties from the waste. She concluded that PDC's treatment of the EAFD waste renders it nonhazardous and subject to delisting.

PDC's next witness was Ajit Chowdhury, a chemical engineer. He testified that PDC hired him to develop a new technology to stabilize EAFD, which he did. He described the chemical process involved in stabilizing EAFD. He testified that the process he created permanently stabilizes the EAFD.

Twenty-seven other individuals presented public comments at the hearing. Some of those individuals were members of the opposition groups, who expressed concerns about the delisting petition. After the hearing ended, the Board accepted written public comments. Many written public comments came from members of the opposition groups. In addition to the public comments, IEPA issued a recommendation, asking the Board to grant PDC's delisting petition.

On January 8, 2009, the Board issued a 103-page opinion and order granting PDC's delisting petition subject to several conditions. <u>In re RCRA Delisting Adjusted Standard Petition of Peoria Disposal Company</u>, Ill. Pollution Control Bd. Op. AS 08-10

4

(January 8, 2009) (hereinafter Board Order).  In its summary, the Board stated:

"Based on a thorough review of this record, the Board finds that PDC has met the legal tests for delisting under Section 28.1 of the Environmental Protection Act \*\*\* and Section 720.122 of the Board's hazardous waste regulations \*\*\*.  PDC has demonstrated that (1) the treatment residue does not meet any of the criteria under which K061 EAF dust was listed as hazardous waste; (2) there is no reasonable basis to believe that factors other than those for which the K061 waste was listed warrant retaining the treatment residue as a hazardous waste; and (3) the treatment residue exhibits no characteristics of hazardous waste.  The scientific evidence presented to the Board shows that the treatment residue meeting the Board's designated delisting levels does not pose a substantial present or potential threat to human health or the environment when considering all of the relevant factors."  Board Order, Ill. Pollution Control Bd. Op. AS 08-10, at 2.

The Board imposed several conditions upon PDC, including (1) requiring analytical proof that every batch of EAFDSR leaving PDC's facility does not contain chemical concentrations in excess of

those found to be safe, (2) adding dioxins and furans to the constituents for which PDC will have to test, 3) tightening the description of disposal facilities that may receive delisted treatment residue, and (4) narrowing the instances when PDC can alter its stabilization process without having to first petition the Board to justify an amendment to the delisting. Board Order, Ill. Pollution Control Bd. Op. AS 08-10, at 2.

In its order, the Board considered many concerns raised in public comments. One of those concerns was whether reopener language used in delistings granted by the United States Environmental Protection Agency (USEPA) should be included in PDC's delisting. The Board found that USEPA reopener language was "unnecessary here to ensure protection of human health and the environment." Board Order, Ill. Pollution Control Bd. Op. AS 08-10, at 77. The Board explained that "Illinois' comprehensive environmental regulations, supplemented by corrective action and injunctive authorities under the Act, provide the ability to promptly detect and remedy problems of the sort the reopener is designed to address." Board Order, Ill. Pollution Control Bd. Op. AS 08-10, at 78. The Board further found that Illinois' system of environmental governance does not lend itself to reopener language. Board Order, Ill. Pollution Control Bd. Op. AS 08-10, at 78.

Next, the Board addressed concerns raised by the opposition

6

groups that PDC did not provide sufficient evidence to satisfy the factors set forth in section 27(a) of the Act (415 ILCS 5/27(a) (West 2008)). The Board stated that it "carefully considered the information in this record in view of the Section 27(a) factors, as required by Section 28.1(a) and finds that the delisting may be granted consistent with those factors." Board Order, Ill. Pollution Control Bd. Op. AS 08-10, at 81. The Board then went on to specifically discuss the location of the facility, its effect on drinking water and potential air emissions, the technical feasability of treating the EAFD with PDC's new technology and the economic reasonableness of PDC's treatment proposal. Board Order, Ill. Pollution Control Bd. Op. AS 08-10, at 81-85.

Next, the Board considered the opposition groups' concern that PDC will need permit modifications if the adjusted standard was granted. PDC responded that it conferred with IEPA and "'confirmed that no permits or permit modifications will be required if the delisting is granted'" because PDC's current permit is "'sufficient to cover PDC's operations in treating the EAFDSR after delisting.'" Board Order, Ill. Pollution Control Bd. Op. AS 08-10, at 85. Based on PDC's response that no permit modifications were necessary, the Board found the opposition groups' concern unfounded. Board Order, Ill. Pollution Control Bd. Op. AS 08-10, at 86.

Finally, the Board addressed the opposition groups' argument

7

that PDC needed local siting approval because the proposed delisting "'would create a new pollution control facility.'" The Board found that local siting approval was "not a prerequisite to the Board granting this delisting petition." Board Order, Ill. Pollution Control Bd. Op. AS 08-10, at 86. The Board found that in order to rule on the delisting petition, it was not necessary for it to "offer legal opinions on the disputed interpretations of 'new pollution control facility,' 'transfer station' and 'special waste.'" Board Order, Ill. Pollution Control Bd. Op. AS 08-10, at 86.

On February 13, 2009, the opposition groups filed a petition for review of the Board's January 8, 2009, order.

## I. Standing

PDC and the Board argue that the opposition groups lack standing to challenge the Board's order in this case because they do not fall within any of the groups identified in section 41(a) of the Act (415 ILCS 5/41(a) (West 2008)). The opposition groups respond that they have standing pursuant to section 29(a) of the Act (415 ILCS 5/29(a) (West 2008)) because they are persons "adversely affected or threatened" by the delisting.

Whether the opposition groups have standing is a question of law that we review de novo. Malec v. City of Belleville, 384 Ill.

App. 3d 465, 468, 891 N.E.2d 1039, 1042 (2008).

Section 28.1 of the Act, which governs adjusted standards, provides that "[a] final Board determination made under this section may be appealed pursuant to Section 41 of this Act." 415 ILCS 5/28.1(g) (West 2008). Section 41(a) of the Act provides:

"Any party to a Board hearing, any person who filed a complaint on which a hearing was denied, any person who has been denied a variance or permit under this Act, any party adversely affected by a final order or determination of the Board, and any person who participated in the public comment process under subsection (8) of Section 39.5 of this Act [the Clean Air Act Permit Program] may obtain judicial review, by filing a petition for review within 35 days from the date that a copy of the order or other final action sought to be reviewed was served upon the party affected by the order or other final Board action complained of. *** Review of any rule or regulation promulgated by the Board shall not be limited by this section but may also be had as provided in Section 29 of this Act." 415 ILCS 5/41(a) (West 2008).

Section 29(a) states: "Any person adversely affected or threatened by any rule or regulation of the Board may obtain a determination

9

of the validity or application of such rule or regulation by petition for review under Section 41 of this Act."  415 ILCS 5/29(a) (West 2008).

The parties agree that the opposition groups were not parties in the Board proceeding and do not fit within any other category of persons identified in section 41(a).  They disagree, however, about whether the Board's order granting PDC's delisting constitutes a "rule or regulation."  If it does, then the opposition groups have standing pursuant to section 29(a).

It is well established that the Board serves both quasi-judicial and quasi-legislative functions. <u>Environmental Protection Agency v. Pollution Control Board (United States Steel Corp.)</u>, 86 Ill. 2d 390, 399, 427 N.E.2d 162, 166 (1981); <u>Environmental Protection Agency v. Pollution Control Board and The Louis Berkman Co. d/b/a Swenson Spreader Co.</u> ("<u>Swenson Spreader Co.</u>"), 308 Ill. App. 3d 741, 747, 721 N.E.2d 723, 727 (1999).  Quasi-legislative functions include promulgating rules and regulations and placing conditions on variances.  <u>Swenson Spreader Co.</u>, 308 Ill. App. 3d at 747, 721 N.E.2d at 727.  Many aspects of ruling on a petition for an adjusted standard involve quasi-legislative determinations. <u>Swenson Spreader Co.</u>, 308 Ill. App. 3d at 748, 721 N.E.2d at 728. "Quasi-legislative determinations are exercises of the Board's rulemaking powers." <u>Swenson Spreader Co.</u>, 308 Ill. App. 3d at 747,

10

721 N.E.2d at 728.

PDC and the Board contend that the Board's decision was not a legislative or quasi-legislative determination but, rather, an adjudicatory determination, pursuant to section 28.1(a) of the Act. Section 28.1(a) provides: "After adopting a regulation of general applicability, the Board may grant, in a subsequent adjudicatory determination, an adjusted standard for persons who can justify such an adjustment consistent with subsection (a) of Section 27 of the Act." 415 ILCS 5/28.1(a) (West 2008). The opposition groups respond that the Board's order granting PDC's delisting petition was a regulation based on section 27 of the Act, the Board's own rules and the placement of the adjusted standard provisions in the Act.

Section 27(a) provides: "The Board may adopt substantive regulations as described in this Act. Any such regulations *** may include regulations specific to individual persons or sites." 415 ILCS 5/27(a) (West 2008). Additionally, the Board's rules state that "[a]n adjusted standard has the effect of an environmental regulation that would apply to petitioner, if granted, in lieu of the general regulation that would otherwise be applicable to a petitioner and the regulated community." 35 Ill. Adm. Code § 104.400 (2008). Finally, sections 27 and 28.1, which set forth the process for obtaining an adjusted standard, are contained in Title

11

VII of the Act, which is entitled, "Regulations."  415 ILCS 5/26 et seq. (West 2008).  While section 28.1 requires the Board to conduct an adjudicatory hearing to determine whether to grant an adjusted standard petition, the resulting order may act as a regulation specific to the petitioner.

Here, the Board's granting of PDC's petition created a rule or regulation specific to PDC, particularly since the Board imposed several conditions on PDC.  Cf. Monsanto Co. v. Pollution Control Board, 67 Ill. 2d 276, 290, 367 N.E.2d 684, 690 (1977) (power granted to the Board to impose conditions on variances "is tantamount to the quasi-legislative power to make prospective regulations and orders").  Thus, section 29(a) applies and provides the opposition groups with standing to challenge the Board's order.

## II.  Section 27(a) of the Act

The opposition groups argue the Board failed to fully and properly consider the factors set forth in section 27(a) of the Act when it granted PDC's petition.

We review this issue under a manifest weight of the evidence standard.  See Swenson Spreader Co., 308 Ill. App. 3d at 748, 721 N.E.2d at 728.

Section 27(a) of the Act provides in pertinent part:

"In promulgating regulations under this Act, the Board shall take into account the existing physical conditions,

12

the character of the area involved, including the character of surrounding land uses, zoning classifications, the nature of the existing air quality, or receiving body of water, as the case may be, and the technical feasibility and economic reasonableness of measuring or reducing the particular type of pollution."

415 ILCS 5/27(a) (West 2008).

The Illinois Supreme Court has held that this section requires the Board to "consider" or "weigh carefully" the factors set forth in section 27(a) when adopting a regulation; it does not require the Board to make a determination, based on evidence in the record, that the delisting complies with the factors before promulgating it. See Granite City Division of National Steel Co. v. Illinois Pollution Control Board, 155 Ill. 2d 149, 181, 613 N.E.2d 719, 733-34 (1993). The court explained: "Rather than imposing a specific evidentiary burden on the Board ***, section 27(a) provides general standards to guide the Board in the exercise of its broad authority to ensure that the regulations adopted by the Board are reasonable." Granite City, 155 Ill. 2d at 182, 613 N.E.2d at 734; see also Shell Oil Co. v. Illinois Pollution Control Board, 37 Ill. App. 3d 264, 275, 346 N.E.2d 212, 222 (1976) ("the legislature intended the Board's obligation under Section 27 to be a flexible one and a matter of Board discretion, and did not intend by that

13

section to impose a specific evidentiary burden on the Board").

Although not required to do so, the Board specifically addressed the section 27(a) factors, including the character of the area involved and the technical feasibility and economic reasonableness of measuring or reducing the EAFSD. The Board responded to many of the concerns raised in public comments regarding the location of the facility, its effect on drinking water and potential air emissions that may result from the delisting. Ultimately, the Board found that the delisting could be granted "consistent with those factors." We find the Board's ruling on the section 27(a) factors was not against the manifest weight of the evidence.

### III. Permit Modifications

The objectors next contend that the Board erred in granting the delisting petition because it was incomplete. They argue that the petition should have addressed what permit modifications the facility will need in the future. PDC and the Board respond that its rules governing delisting do not require PDC to address potential permit modifications and that alternative measures exist to protect against changes that might occur in the future.

Because this ruling involves the Board's technical expertise and the interpretation of its rules, we will overturn the Board's decision only if it is arbitrary and capricious. See <u>Swenson</u>

14

Spreader Co., 308 Ill. App. 3d at 747-78, 721 N.E.2d at 728.

The Board has adopted rules setting forth the requirements that must be contained in a petition to delist. See 35 Ill. Adm. Code. § 104.406. Those rules do not require that a petitioner provide evidence or information regarding what permit modifications will be necessary for the delisting.

It is the province of the IEPA, not the Board, to grant permits. See 415 ILCS 5/4 (West 2008). Here, PDC conferred with IEPA, and IEPA determined that no future permits would be necessary. If IEPA later determines that permits are necessary, IEPA must notify PDC of such and may institute proceedings to require PDC to obtain the necessary permits. See 415 ILCS 5/31 (West 2008). Thus, safeguards are in place if future permit modifications become necessary. For these reasons, the Board did not err in finding that PDC's delisting petition was complete and should be granted.

IV. Local Siting Approval

The opposition groups argue that PDC was required to obtain local siting approval, pursuant to section 39.2 of the Act (415 ILCS 5/39.2 (West 2008)), because the delisting creates a "new pollution control facility." They contend that PDC has created a new pollution control facility by accepting EAFDSR for the first time. They further contend that PDC is transforming its facility

15

from a waste disposal facility to a waste transfer facility because "in the very near future, none of the EAF dust treated in the waste stabilization facility (EAFDSR) will be deposited in the PDC No. 1 Landfill."

We review this issue under a manifest weight of the evidence standard. See Swenson Spreader Co., 308 Ill. App. 3d at 748, 721 N.E.2d at 728.

Section 39.2 of the Act requires local siting approval for new pollution control facilities. See 415 ILCS 5/39.2 (West 2008). The definition of a "new pollution control facility" includes (1) "the area of expansion beyond the boundary of a currently permitted pollution control facility," and (2) "a permitted pollution control facility requesting approval to store, dispose of, transfer or incinerate, for the first time, any special or hazardous waste." 415 ILCS 5/3.330(b) (West 2008). When a facility only transfers waste, it is a "transfer station," which "accepts waste for temporary storage or consolidation and further transfer to a waste disposal, treatment or storage facility." 415 ILCS 5/3.500 (West 2008).

Here, the actions proposed by PDC do not fit the definition of a new pollution control facility. PDC filed its delisting petition so that it could process EAFD and turn it into EAFDSR, a non-hazardous product. PDC is not seeking an expansion beyond the

16

boundaries of its current WSF or adjoining landfill. Additionally, PDC is not asking to deal with special or hazardous waste for the first time. The facility is already permitted to and does treat hazardous waste. Furthermore, after treatment, EAFDSR is not a hazardous waste. PDC's petition for an adjusted standard does not contemplate the creation of a "new pollution control facility" as that term is defined in section 3.330 of the Act. The Board properly found that local siting approval was not necessary.

We also reject the opposition groups' contention that PDC is operating a transfer station. The WSF is a facility designed to treat waste. A transfer station does not treat waste but merely stores it temporarily or consolidates it for further transfer. 415 ILCS 5/3.500 (West 2008). Since PDC is treating waste, it is not operating a transfer station.

Nevertheless, the opposition groups suggest that PDC will be transporting all of its waste to off-site facilities in the future and thus become a transfer station. However, this is not the issue in this case. The Board determined that the issue before it was not the legal interpretation of terms such as "new pollution control facility" or "transfer station" and how they might be applied. Board Order, Ill. Pollution Control Bd. Op. AS 08-10, at 86. Rather, the issue was whether the delisting petition could be allowed. We agree. The Board correctly found that the petition

17

should be granted.

## V.   Reopener Language

Finally, the opposition groups argue that the Board should have required reopener language as a condition to granting PDC's petition.

Because this ruling involves the Board's technical expertise and interpretation of the Board's rules, we will overturn the Board's decision only if it is arbitrary and capricious.   See Swenson Spreader Co., 308 Ill. App. 3d at 747-78, 721 N.E.2d at 728.

When the USEPA grants delistings, their orders often contain "reopener language."   See 40 C.F.R. Part 261, App. IX (2008). Reopener language requires a facility to report to the Regional Administrator any data relevant to the delisted waste indicating that any constituent is at a level higher than the delisting level. See 40 C.F.R. Part 261, App. IX (2008).   Based on such information, the Regional Administrator may take whatever action is necessary to protect human health or environment, including suspending or revoking the exclusion.   See 40 C.F.R. Part 261, App. IX (2008).

In Illinois, IEPA and state and local officials have broad authority to take action to protect human health and the environment when a potentially hazardous or dangerous condition exists.   Pursuant to section 4(s) of the Act, IEPA "shall have

18

authority to take whatever preventive or corrective action is necessary or appropriate *** whenever any hazardous substance or pesticide is released or there is a substantial threat of such a release into the environment." 415 ILCS 5/4(s) (West 2008). Pursuant to section 42(e) of the Act, State's Attorneys or the Attorney General, may, at the request of IEPA, or on their own motion, institute a civil action to enjoin or restrain violations of the Act, any rule or regulation adopted under the Act, any permit or term or condition of a permit or any Board order. 415 ILCS 5/42(e) (West 2008). Furthermore, section 43(a) of the Act authorizes State's Attorneys or the Attorney General, on the request of IEPA or their own motion, to institute a civil action for an immediate injunction to halt any discharge or any other activity causing or contributing to any danger to the environment or to the public health. 415 ILCS 5/43(a) (West 2008). Because Illinois authorizes corrective action and injunctive relief under the Act, reopener language like that contained in USEPA delistings is unnecessary for delistings in this state.

We find that reopener language is not only unnecessary but futile based on Illinois' system of environmental governance. Unlike the federal system, where USEPA is responsible for both creating and enforcing environmental regulations, in Illinois, the responsibility for environmental regulation and enforcement is

19

divided between IEPA and the Board.  See 415 ILCS 5/4 & 5/5 (West 2008).  IEPA is responsible for permitting, site inspections and enforcement actions.  See 415 ILCS 5/4 (West 2008). The Board's duties include determining, defining and implementing environmental control standards and conducting proceedings on complaints charging violations of the Act, regulations or Board orders, on petitions for variances or adjusted standards and on administrative citations.  See 415 ILCS 5/5(c) & (d) (West 2008).  Once an adjusted standard is granted by the Board, the Board no longer has authority to take any action with respect to the facility.  At that point, IEPA is in charge of site inspections and any institute enforcement actions that may be necessary.  See 415 ILCS 5/4 (West 2008).  Because the Board has no authority to initiate enforcement, any reopener language would serve no purpose.  Thus, the Board did not err in refusing to include it in its order.

VI. Conclusion

We affirm the order of the Illinois Pollution Control Board.

Affirm.


JUSTICE CARTER, specially concurring.

It is my conclusion that the opposition groups do not have standing to bring the instant appeal.  I would dismiss this appeal, which has the effect of affirming the order of the

20

Illinois Pollution Control Board. See People v. Griffith, 212 Ill. 2d 57, 58, 816 N.E.2d 353, 354 (2004) (the effect of the dismissal of an appeal is an affirmance of the decision under review). Thus, I concur in the resulting judgment of the lead decision to affirm.

Under title 35, section 720.122(n), of the Illinois Administrative Code (the Code), "Delistings that have not been adopted by USEPA may be proposed to the Board pursuant to a petition for adjusted standard pursuant to Section 28.1 of the [Illinois Environmental Protection] Act [(415 ILCS 5/28.1)] and Subpart D of 35 Ill. Adm. Code 104." 35 Ill. Adm. Code §720.122(n). Subpart D of Title 35, part 104, of the Code sets forth the procedure to be followed when filing a petition for an adjusted standard with the Pollution Control Board (the Board), including provisions related to notice and public hearings. Section 28.1 of the Illinois Environmental Protection Act (the Act) grants authority to the Board to grant a petitioner an adjusted standard. 415 ILCS 5/28.1(a) (West 2008). Section 28.1 provides:

   "(a) After adopting a regulation of general applicability, the Board may grant, in a subsequent adjudicatory determination, an adjusted standard for persons who can justify such an adjustment consistent

21

with subsection (a) of Section 27 of this Act. *** The rule-making provisions of the Illinois Administrative Procedure Act and Title VII of this Act shall not apply to such subsequent determinations.

***

(g) A final Board determination made under this Section may be appealed pursuant to Section 41 of this Act."  415 ILCS 5/28.1(a) (West 2008).

Title VII of the Act grants the Board the authority to adopt rules and regulations necessary to accomplish the purposes of the Act.  In addition, Title VII of the Act sets forth statutory guidelines for adopting rules and regulations, including provisions for public hearings.  The final section of Title VII is section 29, entitled "Review."  415 ILCS 5/29 (West 2008). Section 29(a) states, "Any person adversely affected or threatened by any rule or regulation of the Board may obtain a determination of the validity or application of such rule or regulation by petition for review under Section 41 of this Act." 415 ILCS 5/29(a) (West 2008).

Peoria Disposal Company (PDC) contends that the opposition groups lack standing to appeal the Board's decision to grant PDC the adjusted standard.  PDC argues that section 41 of the Act governs appeals of Board decisions regarding adjusted standards,

22

and that the opposition groups do not fit into any of the categories set forth in section 41 of those who may appeal such decisions of the Board.  The opposition groups disagree.  They maintain that the authority to appeal Board decisions granting an adjusted standard is found in section 29 of the Act because, they argue, the decision to grant an adjusted standard is classified as a rule or regulation.  Further, they argue that they are included within the broader language of section 29 of those who may petition for review of Board rules or regulations.

Section 41 of the Act provides for judicial review of acts of the Board and that judicial review shall be afforded directly in the Appellate Court for the District in which the cause of action arose.  415 ILCS 5/41 (West 2008).  Section 41(a) specifically delineates who may obtain judicial review of acts of the Board: (1) "[a]ny party to a Board hearing"; (2) "any person who filed a complaint on which a hearing was denied"; (3) "any person who has been denied a variance or permit under this Act"; (4) "any party adversely affected by a final order or determination of the Board"; and (5) "any person who participated in the public comment process under subsection (8) of Section 39.5 of this Act."   415 ILCS 5/41(a) (West 2008).   In addition section 41(a) states, "Review of any rule or regulation promulgated by the Board shall not be limited by this section but

23

may also be had as provided in Section 29 of this Act."  415 ILCS 5/41(a) (West 2008).

Section 29 allows for review of rules and regulations promulgated by the Board by petition for review under section 41. The categorization of who may petition for review is broader under section 29 than under section 41.  Section 29(a) states that "[a]ny person adversely affected or threatened by any rule or regulation of the Board may obtain a determination of the validity or application of such rule or regulation by petition for review under Section 41 of this Act."  415 ILCS 5/29(a) (West 2008).  Thus, a determination of whether the opposition groups have standing in this appeal hinges upon a determination of whether a Board decision to grant an adjusted standard under section 28.1 of the Act is an adjudicatory decision or a rule-making decision.  In other words, must the opposition groups fit within the categories of section 41 or section 29 to have standing to bring this appeal?

The Board's decision to grant PDC an adjusted standard was authorized by section 28.1 of the Act.  415 ILCS 5/28.1 (West 2008).  An examination of section 28.1 indicates that this decision is an adjudicatory decision and an appeal of such a decision is governed solely by section 41 of the Act.  Section 28.1(a) specifically states that the decision to grant an

24

adjusted standard is an "adjudicatory determination." 415 ILCS 5/28.1(a) (West 2008). Additionally, the last sentence of section 28.1(a) states that the rule-making provisions of "Title VII of this Act shall not apply" to these decisions. 415 ILCS 5/28.1(a) (West 2008). Significantly, section 29, providing for judicial review of rules and regulations, is the last section of Title VII of the Act. Furthermore, section 28.1(g) provides, "A final Board determination under this Section may be appealed pursuant to Section 41 of this Act." 415 ILCS 5/28.1(g) (West 2008). Thus, the statute under which the Board made the decision at issue here directs that appeals are governed by section 41, not section 29, of the Act.

The opposition groups argue that this court should read sections 41 and 29 together, to allow the groups standing. Section 41 does reference section 29 and specifically states that the limitations in section 41 as to who may petition for review of an adjudicatory decision shall not apply to petitions for review of rules and regulations as set forth in section 29. However, that leads back to the same question of whether a decision under section 28.1 of the Act is an adjudicatory decision or a rule-making decision. As set forth above, section 28.1 indicates that decisions made under that section are

25

adjudicatory decisions and that the rule-making provisions of Title VII do not apply to these decisions.  Thus, section 29 has no applicability to the petition for review brought by the opposition groups.

The lead opinion cites <u>Environmental Protection Agency v. Pollution Control Board</u>, 308 Ill. App. 3d 741, 721 N.E.2d 723 (1999) (<u>Swenson Spreader Co.</u>), to support its conclusion that the Board's decision in this matter was a quasi-legislative determination and that section 29 provided the opposition groups with standing to challenge that determination.  In <u>Swenson Spreader Co.</u>, the court was called upon to decide what standard of review to apply to the Board's decision.  <u>Swenson Spreader Co.</u>, 308 Ill. App. 3d at 747, 721 N.E.2d at 727.  The court recognized that the Board serves both quasi-legislative and quasi-adjudicatory functions and that different standards of review apply to different functions.  <u>Swenson Spreader Co.</u>, 308 Ill. App. 3d at 747, 721 N.E.2d at 727.  Also, the court specifically recognized that proceedings for an adjusted standard are adversarial in nature and, thus, are adjudicatory proceedings.  <u>Swenson Spreader Co.</u>, 308 Ill. App. 3d at 748, 721 N.E.2d at 728.  The court went on to reason that certain aspects of a decision to grant or deny an adjusted standard are quasi-legislative determinations, and the court should apply the

26

arbitrary and capricious standard of review to those quasi-legislative determinations.  Swenson Spreader Co., 308 Ill. App. 3d at 748-49, 721 N.E.2d at 728-29.  I disagree with the lead opinion's conclusion that this case supports its conclusion that a proceeding to determine whether to grant a petition for an adjusted standard is a rule-making procedure.

Finally, as the opposition groups appear to concede, the opposition groups do not fit within the categories of those who may petition an adjudicatory order of the Board under section 41. The opposition groups were not parties to the proceedings below and, thus, do not fit within the first or fourth category in section 41.  See Lake County Contractors Ass'n v. Pollution Control Board, 54 Ill. 2d 16, 19-21, 294 N.E.2d 259, 261-62 (1973) (concluding that to come within the fourth category of section 41, one who seeks review must have been a party to the Board proceeding and rejecting contention that "party" means "person").  The opposition groups did not file a complaint on which a hearing was denied; they were not denied a variance or permit, nor was this case brought under section 39.5 of the Act (Clean Air Act permit program).  Thus, the opposition groups do not fall within the categories of those authorized to petition for a review of a Board's decision to grant an adjusted standard.

In addition, the Code provides for intervention in

27

adjudicatory proceedings. 35 Ill. Adm. Code §101.402. Here, the opposition groups did not seek leave to intervene and gain party status in the adjudicatory proceeding before the Board. Although the opposition groups did participate in the Board proceedings by providing public comments, as allowed by the Code (35 Ill. Adm. Code §§101.110, 101.628), that participation did not grant them party status and the ability to appeal the Board's adjudicatory decision under section 41 of the Act (415 ILCS 5/41(a) (West 2008)).

For all of the above reasons, I would dismiss this appeal due to a lack of standing, and therefore, I concur in the judgment of the lead decision to affirm the order of the Illinois Pollution Control Board.

JUSTICE WRIGHT concurring in part and dissenting in part:

I concur with that portion of Justice Lytton's opinion that concludes the opposition groups have standing to bring this appeal.

I respectfully suggest that the special concurring decision incorrectly concludes that the Act prohibits judicial review of an adjusted standard decision based on whether the appellant has filed a petition to intervene with the Board. First, there is no statutory right to intervene under the Act. The only possibility for intervention is based on Board's procedural rule found at

28

section 101.402(d) of Title 35 of the Code. 35 Ill. Adm. Code §101.402(d).

Recently, the Board has been extremely reluctant to allow intervention in an adjusted standard proceeding because there are other opportunities for either a person or a group to participate in an adjusted standard proceeding without formal intervention. In fact, after reviewing all cases requesting the Board to grant an adjusted standard since 1988, it appears to me that the Board has denied every request for intervention in an adjusted standard proceeding. See *In re Petition of Peoria Disposal Company for an Adjusted Standard from 35 Ill. Adm. Code 721. Subpart D*, Ill. Pollution Control Bd. Op. AS 91--03 (Mar. 11, 1993) (hereinafter *Peoria Disposal*); *In re Petition of Midwest Generation, L.L.C., Waukegan Generating Station for an Adjusted Standard from 35 Ill. Adm. Code 225.230*, Ill. Pollution Control Bd. Op. AS 07--03, at 6 (April 17, 2008) (order denying petition to intervene); *In re Petition of Midwest Generation, L.L.C., Will County Generating Station for an Adjusted Standard from 35 Ill. Adm. Code 225.230*, Ill. Pollution Control Bd. Op. AS 07--04 at 6 (April 17, 2008) (order denying petition to intevene) (hereinafter *Midwest Generation*).

In its decision in AS 07--04, the Board noted that participants in an adjusted standard proceeding are allowed to

29

make oral statements under oath, subject to cross-examination, pursuant to section 101.628. *Midwest Generation*, Ill. Pollution Control Bd. Op. AS 07--04 at 6. In the same order, the Board also noted that the Board may also grant leave to file an amicus curiae brief pursuant to section 101.110(c). *Midwest Generation*, Ill. Pollution Control Bd. Op. AS 07--04 at 6. Consequently, the Board stated:

> " [T]he Board finds that participation by ELPC [Environmental Law & Policy Center] through oral comments at the hearing and the filing of an amicus curiae brief will address any potential prejudice suffered by ELPC and the membership of ELPC. Therefore, the Board denies the motion to intervene." *Midwest Generation*, Ill. Pollution Control Bd. Op. AS 07--04 at 6.

I note that the Board has not directed this court to any previous Board decision which allows a person or group to intervene in an adjusted standard proceeding. Moreover, PDC has successfully resisted an intervenor's request in the past. See *Peoria Disposal*, Ill. Pollution Control Bd. Op. AS 91--03. In that case, the docket shows that the hearing officer denied Envirite's motion to intervene but allowed Envirite's comments to be admitted into the record as an amicus curiae brief.

Based on this history, in my opinion, the fact that the

30

opposition groups did not initiate an inevitably futile request for intervention should have no significance on the issue of standing. Consequently, I respectfully suggest that the language adopted in section 41 of the Act, which does not limit judicial review of a rule or regulation to those categories of persons set out in section 41, demonstrates the legislative intent to allow persons adversely affected by an adjusted standard to seek judicial review pursuant to section 29 of the Act regardless of party status.

If standing to seek judicial review of the Board's final determination granting an adjusted standard is soley dependent on party status, then the Board can successfully truncate judicial review of all final orders allowing an adjusted standard by simply developing an unwritten policy to deny all nonpetitioners' requests to intervene. Certainly, this was not the intention of the legislature nor the intention of the Board when denying the previous requests to intervene in other adjusted standard proceedings.

I respectfully suggest that the language of section 28.1(a) declaring the "rule-making provisions of the of the Illinois Administrative Procedure Act and Title VII of the Act" inapplicable to an adjusted standard proceeding simply means that an individual adjusted standard petitioner is relieved of the

31

necessity for publication and cost study requirements mandated when the Board is enacting general regulations rather than individual adjusted standards. 415 ILCS 5/28.1(a) (West 2008), 5 ILCS 100/5--5 *et seq.* (West 2008). For the reasons set out above, I concur in Justice Lytton's decision that the opposition groups have standing to seek judicial review in this appeal. However, I dissent from that portion of the decision that affirms the Board's decision to allow an adjusted standard in this case.

### Burden of Proof

Here, PDC requested the Board to "delist stabilized residue generated from treatment of K061 electric arc furnace [EAF] dust at PDC's waste stabilization facility [WSF] in Peoria County." Presumably based on the toxicity of K061, after first considering the section 27(a) factors when adopting the general regulation, the Board itself did *not* define "the level of justification" for future adjusted standards. In this context, a person may request the Board to create a new individualized regulation designated as an "individual adjusted standard" under Article VII, section 28.1 of the Act. 415 ILCS 5/28.1 (West 2008).

Section 28.1 requires that the Board "shall adopt procedures applicable to such adjusted standards determinations." 415 ILCS 5/28.1 (West 2008). The applicable procedures adopted by the Board for an adjusted standard petitioner, such as PDC, provide:

32

"The *burden of proof* in an adjusted standard

proceeding is on the petitioner.  A *petitioner must*

*justify* an adjusted standard consistent with Section 27(a)

of the [Environmental Protection] Act."  (Emphasis added.)

35 Ill. Adm. Code §104.426.

This appears to be a threshold requirement before the Board goes on to consider the other four factors for justification set out in Section 104.426(a).  Contrary to this regulation, the Board's order in this case states:

"[T]here is no threshold of evidence that the adjusted

standard petitioner must meet with respect to those

[Section 27(a)] factors."  *In re RCRA Delisting Adjusted*

*Standard Petition of Peoria Disposal Company*, Ill.

Pollution Control Bd. Op. AS 08--10, at 81 (January 8,

2009) (hereinafter *Board Order*).

Further, the Board's order granting the adjusted standard contains the heading **"Burden of Proof,"** *Board Order*, Ill. Pollution Control Bd. Op. AS 08--10, at 31.  Within this section of the Board Order, the Board does not acknowledge or apply section 104.426 of Title 35 of the Illinois Administrative Code (Code).

In this appeal, we are called upon to determine whether the Board correctly decided, as a matter of law, that PDC had "no

33

threshold of evidence" to meet with respect to the section 27(a) factors.  When addressing this issue, this court must apply a *de novo* standard of review when construing the language of a regulation such as section 104.426 of Title 35 of the Code. *Peoria Disposal Co. v. Illinois Pollution Control Board*, 385 Ill. App. 3d 781 (2008), *appeal denied*, 231 Ill. 2d 654 (2009).

The Board's regulation places the burden of proof squarely on the shoulders of the petitioner.  Hence, the individual adjusted standard petitioner must introduce a sufficient threshold of evidence to satisfy the section 27(a) factors.  Yet, the Board's order states that, as to the section 27(a) factors, PDC had "no threshold of evidence" to meet in this case.

I conclude that the Board improperly relieved PDC of its burden of proof in this case by concluding that PDC had "no threshold of evidence" to meet with regard to the section 27(a) factors contrary to the mandates of section 104.426.

Quasi-legislative vs. Quasi-Judicial

Standards of Review

Before considering the other issues raised in the opposition groups' appeal, it is important to determine what standard of review to apply to the separate components of the Board's decision in this case.  In the *Swenson Spreader Co.* case, the court stated:

34

"Quasi-legislative determinations are exercises of the Board's rulemaking powers.  The supreme court has instructed that "[w]hen an agency has acted in its rulemaking capacity, a court will not substitute its judgment for that of the agency." *Granite City* [*Division of National Steel Co. v. Illinois Pollution Control Board*], [155 Ill. 2d 149, 162 (1993)].  For this reason, the Board's quasi-legislative decisions will not be overturned unless they are arbitrary and capricious. *Granite City,* 155 Ill. 2d at 162, \*\*\*.

The Board acts in a quasi-judicial capacity when it determines rights or liabilities in an individual case based on the particular facts of the case. [Citation.] \*\*\* A reviewing court will uphold a quasi-judicial determination unless it is contrary to the manifest weight of the evidence. [Citation.]  When a case involves both quasi-legislative and quasi-judicial functions, the reviewing court should apply both standards of review. [Citations.]

\* \* \*

There are three methods by which an entity can seek relief from a rule of general applicability: variances, adjusted standards, and site-specific regulations.

35

Adjusted standards are similar to variances in certain respects. In proceedings for both variances and adjusted standards, the Board's decisions must be supported by a written opinion with specific findings of fact. See 415 ILCS 5/28.1(d), 35(a) (West 1996). Proceedings for both a petition for a variance and a petition for an adjusted standard are adversarial in nature ***. Furthermore, the Act deems petitions for an adjusted standard "adjudicatory" proceedings. 415 ILCS 5/28.1 (West 1996). This being said, many aspects of a ruling on a petition for an adjusted standard involve the Board's technical expertise and interpretation of rules, which are quasi-legislative determinations. [Citations.]" *Environmental Protection Agency v. Pollution Control Board*, 308 Ill. App. 3d 741, 747-49 (1999) (*Swenson Spreader Co.*).

The quasi-legislative nature of an individual adjusted standard is confirmed by the Board's regulation which states that the effect of an adjusted standard creates an environmental regulation. 35 Ill. Adm. Code §104.400. It is fair to say that an adjusted standard is a hybrid proceeding that invokes the Board's quasi-judicial as well as its quasi-legislative authority. Typically, the Board relies on its technical

36

expertise when evaluating the sufficiency of the petitioner's evidence, specifically the section 27(a) factors in this case. *Swenson Spreader Co.*, 308 Ill. App. 3d at 750-51. We review all decisions of the Board that involve the Board's technical expertise using an aribtrary and capricious standard of review. See *Swenson Spreader Co.*, 308 Ill. App. 3d at 748-49.

After the Board determines that the adjusted standard petitioner has satisfied its burden of proof as set out in section 104.426, then the Board exerts its quasi-legislative authority when granting the new environmental regulation, designated as an individual adjusted standard. Developing conditions applicable to the individual adjusted standard also involve the Board's expertise and should be measured by the same arbitrary and capricious standard of review. The additional issues raised by appellants are discussed below with the appropriate standard of review in mind.

## Section 28.1

The appellants challenge the Board's order because the order is conclusory and does not contain specific findings of fact based on the evidence presented to the Board by PDC. In response, PDC relies on *Granite City* after arguably conceding that the Board acted in a quasi-legislative capacity when granting the adjusted standard in this case. It is important to

37

note that PDC asks this court to deny standing to the opposition groups because the Board was acting in a quasi-judicial capacity when adopting this adjusted standard, yet contends the Board acted in a quasi-legislative capacity for purposes of arguing that the Board did not need to state specific findings to support its conclusions under sections 28.1 and 27(a) of the Act. In *Granite City*, our supreme court stated:

> "When acting in its quasi-legislative capacity, the Board has no burden to support its conclusions with a given quantum of evidence." *Granite City*, 155 Ill. 2d at 180.

I respectfully suggest that PDC's reliance on *Granite City*, 155 Ill. 2d 149, has misdirected this court. PDC has over-generalized the holding in *Granite City* for several reasons.

First, *Granite City* did not involve an adjusted standard request as does the case at bar.

In *Granite City*, our supreme court only considered the *Board's* statutory obligation when *first* creating substantive environmental regulations, rather than the Board's *subsequent* regulatory obligations when considering an individual adjusted standard from a regulation of general applicability. In that limited context of enacting general regulations, our supreme court held that the Board is not required by statute to recite a

38

specific quantum of proof to support its conclusions. This holding has no application to the Board's procedures when deciding an individual adjusted standard petition.

In fact, section 28.1(d) of the Act specifically requires the Board to support any decision to grant an adjusted standard with a written order and opinion which "shall" state the facts and reasons leading to the final Board determination. See 415 ILCS 5/28.1(d) (West 2008). Section 28.1 of the Act provides:

> "*After* adopting a regulation of general applicability, the Board may grant, in a subsequent adjudicatory determination, an adjusted standard for persons who can justify such an adjustment consistent with subsection (a) of Section 27 of this Act." (Emphasis added.) 415 ILCS 5/28.1 (West 2008).

Section 28.1 of the Act first requires the petitioner, not the Board, to justify the adjusted standard. Next, section 28.1 requires the Board to issue an order which includes factual findings and reasons presumably explaining how the petitioner justified the adjusted standard before the Board.

The Board's order in the case at bar does not contain specific findings or reasoning concerning the section 27(a) factors in the context of PDC's evidence submitted to the Board. Therefore, I agree with the appellant's view that the Board's order in this case cannot be upheld in the absence of the factual findings and reasons required by section 28.1 of the Act.

### Section 27(a) Factors

Arguably, the Board's failure to include specific findings of fact with regard to the

39

section 27(a) factors may be directly related to an absence of such evidence introduced into the record by PDC. Section 27(a) of the Act provides:

> "In promulgating regulations under this Act, the Board shall take into account the existing physical conditions, the character of the area involved, including the character of surrounding land uses, zoning classifications, the nature of the existing air quality, or receiving body of water, as the case may be, and the technical feasibility and economic reasonableness of measuring or reducing the particular type of pollution. The generality of this grant of authority shall only be limited by the specifications of particular classes of regulations elsewhere in this Act." 415 ILCS 5/27(a) (West 2008).

In this case, there are two geographic areas involved or potentially affected by operations allowed by the adjusted standard. The first area potentially affected is the expanding residential neighborhood in Peoria near PDC's WSF. After the K061 is generated by PDC's customers, the waste is delivered to Peoria, where PDC treats the K061 with a 'new' chemical process and stores the K061 above ground and outdoors before the waste is verified as EAFDSR. For the K061 unsuccessfully treated, PDC will transfer K061 to a hazardous landfill for disposal. After verification, or in other words, successful treatment, PDC transfers EAFDSR from Peoria to Tazewell County. Thus, the second "involved" area is located in Tazewell County, where the successfully treated K061, now labeled EAFDSR, will be disposed according to the conditions attached to the adjusted standard.

During the public hearing, PDC did not introduce any stipulations or any agreed exhibits and failed to provide expert or lay testimony concerning the section 27(a) factors with regard to

either geographic location. In fact, PDC presented only two witnesses and four exhibits to the Board during the public hearing. One witness, Laura Curtis, a senior environmental engineer at RMT, Inc., and PDC's independent consultant, testified about the new chemical process developed for PDC to stabilize electric arc furnace dust (EAFD) waste. A second witness, Dr. Ajit Chowdhury, a former employee of RMT, testified that PDC hired him to develop the new chemical process for stabilizing K061 waste. PDC will then license the process from Chowdhury because Chowdhury is considering patenting his technique. At the time of the delisting hearing, Chowdhury, RMT, and PDC representatives stated they were not at liberty to discuss the exact chemicals used in this new treatment process because it was a trade secret. Once the delisting is granted, Chowdhury will be paid licensing fees by PDC. The four exhibits PDC introduced for the Board's consideration included: Exhibits 1 and 2 which were Curtis' resume and the outline of her testimony; Exhibit 3 consisted of Dr. Chowdhury's resume; and Exhibit 4 was the list of 10 steel mills currently generating K061 waste and delivering the K061 to PDC for treatment and on-site disposal.

Although the Board stated that it "carefully considered the information in this record in view of the Section 27(a) factors, as required by Section 28.1(a) and finds that the delisting may be granted consistent with those factors," the Board does not state any "facts and reasons" which caused the Board to conclude PDC's evidence satisfied PDC's burden of proof to justify the individual adjusted standard as required by section 28.1 of the Act. The absence of any *specific* "facts and reasons" concerning the section 27(a) factors renders the Board's decision arbitrary and capricious.

Board's Decision is Arbitrary and Capricious

41

In *Greer v. Illinois Housing Development Authority,* 122 Ill. 2d 462 (1988), our supreme court provided the following guidelines for this court to apply when determining whether an administrative agency's action is arbitrary and capricious. Our supreme court held:

> "Agency action is arbitrary and capricious if the agency: (1) relies on factors which the legislature did not intend for the agency to consider; (2) entirely fails to consider an important aspect of the problem; or (3) offers an explanation for its decision which runs counter to the evidence before the agency, or which is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Greer,* 122 Ill. 2d at 505-06, citing *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43, 77 L. Ed. 2d 443, 458, 103 S. Ct. 2856, 2866-67 (1983).

In this case, I focus on the second and third factors set out by our supreme court. First, the Board failed to consider an important aspect of the problem, namely, whether PDC met the burden of proof assigned to an individual adjusted standard petitioner by section 104.426 of the Board's own regulations. Second, the Board's statement, that it carefully considered the section 27(a) factors in light of the record, offers an explanation that cannot be reconciled with the record by this court because the Board's order simply does not contain written findings or identify any substantive evidence supporting the Board's conclusions for this court to reconcile.

In my view, the absence of any findings or conclusions stating that the individual adjusted standard would not result in environmental or health effects more adverse than those considered by the Board when originally adopting the general regulation consistent with the

section 27(a) factors, renders the Board's ruling purely arbitrary. For the reasons discussed above, I conclude the Board's decision was arbitrary and capricious, and must be reversed.

The Basis of the Petition

In addition to applying the incorrect burden of proof concerning the section 27(a) factors, the Board does not make any findings concerning the basis of the petition pursuant to either subsection (a) or (b) of section 720.122. The carelessness of the Board's approach is evident in the Board's ultimate, incomplete finding set out below:

> "Based on all the foregoing, the Board finds that PDC has [blank in original] its burden of proof under the RCRA regulations for receipt of a delisting. See 35 Ill. Adm. Code 720.122(a), (b), (d), (h), (i), (p)." Board Order, Ill. Pollution Control Bd. Op. AS 08–10, at 57.

Obviously, this finding set out by the Board, on page 57 of its order, does not state whether PDC "satisfied" or "did not satisfy" its burden of proof in any context.

In the individual adjusted standard petition, PDC requested the Board to "delist stabilized residue generated from treatment of K061 electric arc furnace [EAF] dust at PDC's waste stabilization facility [WSF] in Peoria County." On page 7 of the Board's order, the Board acknowledges "PDC addresses both subsections (a) and (b) of Section 720.122." *Board Order*, Ill. Pollution Control Bd. Op. AS 08--10, at 7. However, the Board does not specify on what basis the individual adjusted standard was granted. The only finding adopted by the Board regarding the regulatory basis for the petition states, "[T]he Board finds that PDC has [blank in original] its burden of proof under the RCRA regulations for receipt of a delisting. See 35 Ill. Adm. Code 720.122(a), (b), (d), (h), (i), (p)." *Board Order*, Ill. Pollution Control Bd. Op. AS 08--10, at 57.

43

I point out that each paragraph of section 720.122 of Title 35 of the Code sets out distinct but separate considerations for an adjusted standard request. 35 Ill. Adm. Code §720.122. Paragraph (a) requires waste to be delisted by waste stream from a single generator. Paragraph (b) requires an analysis of the combined waste mixture as a whole with respect to those additional constituents that PDC adds to stabilize the F061 delivered the WSF. The requirements of paragraph (a) and (b) are not interchangeable.

The Board does not address whether PDC satisfied their burden of proof with regard to subparagraph (a) alone, subparagraph (b) alone, or met some of the requirements set out in subparagraph (a) and others set out in subparagraph (b) of section 720.122 of Title 35 of the Code. 35 Ill. Adm. Code §§720.122(a), (b). The glaring absence of any findings by the Board with regard to section 720.122(a) or (b) makes it impossible for this court to evaluate the sufficiency of the factual basis for the Board's order granting the PDC's petition to delist successfully treated K061 waste.

At the very least, this court should now remand the matter to the Board for specific findings with regard to the separate requirements of section 720.122(a) or (b) before deciding whether those findings are supported by the record or may conflict with previous precedent from this court.

New Pollution Control Facility

PDC's EAFDSR involves a new chemical process recently developed for PDC long after it received a permit for its WSF. The Board's order acknowledges that PDC has *never* managed EAFDSR in a landfill prior to the handful of demonstration trials related to this petition. Board Order, Ill. Pollution Control Bd. Op. AS 08-10, at 20. Similarly, PDC has *never* transferred the

44

EAFDSR to another landfill for disposal. Finally, EAFDSR has *never* been disposed in a Class D landfill and commingled with other waste accepted by the Class D land-based unit.

In the past 20 years, PDC has merely accepted K061 dust from 10 separate steel producers for disposal on site. However, before disposing of the waste in its hazardous landfill, PDC managed the waste for the sole purpose of placing it in PDC's Class C landfill by treating it in PDC's containment building and waste stabilization facility (WSF). After treating and temporarily storing K061 indoors in the WSF, a fully enclosed steel structure, PDC then disposed of the treated K061 below ground, in a dedicated hazardous waste landfill at the same location. Over the course of the last 20 years, K061 waste has never left PDC's site and subsequently reentered the Peoria community during transfer to another location for disposal. Now, PDC wishes to delist the new substance labeled EAFDSR and, after delisting, will transfer and transport the waste off site for disposal elsewhere.

PDC's petition, and the Board's order, assumes some portion of the K061 waste delivered to PDC will never meet the requirements for delisting the purported EAFDSR after initial treatment and retreatment by PDC. In this event, the Board requires PDC to dispose of K061 waste in a Class C landfill. However, PDC no longer has the capacity to dispose of K061 waste in its Class C landfill and must now transfer unsuccessfully treated K061 waste to a different hazardous landfill for disposal. Thus, for the first time PDC will act as a transfer station by transferring nondelisted, hazardous K061 waste off site. It is also important to note that PDC's petition states that PDC should not be considered the "generator" of the EAFDSR waste, presumably for purposes of section 720.122(a), until after the treated waste meets the adjusted standard criteria. See *Board Order*, Ill. Pollution Control Bd. Op. AS 08--10, at 5.

45

I conclude that PDC's new, first-time operation as an above ground storage yard and transfer station for future off-site disposal falls squarely within the definition of a new pollution control facility that the County must approve for siting regardless of whether the K061 waste is hazardous or delisted as nonhazardous EAFDSR.  415 ILCS 5/3.330(b) (West 2006).

Summary

The undeniable reality is that PDC No. 1 Landfill presumably has now reached capacity at the time of this appeal.  I understand the steel manufacturers in Illinois need a cost-effective method to dispose of their Illinois-generated waste.  Yet, 60% of the waste delisted for PDC originates with out-of-state customers.  Perhaps, these out-of-state generators may have hazardous landfills available in their home states.  Nonetheless, due to the conditions attached to PDC's adjusted standard, the K061 hazardous waste delivered to PDC from out-of-state sources will continue to be delivered to PDC and then remain in Illinois for perpetuity.  The individual adjusted standard thereby ultimately reduces the availability of space in Illinois landfills for Illinois manufacturers.

The individual adjusted standard not only allows PDC to continue to accept K061 waste generated by outside sources, but now also allows, for the first time, PDC to store K061 outdoors and then transfer treated K061 to other facilities for disposal.  This new component of PDC's business, namely, transferring large quantities of treated K061 waste from Peoria to another location for disposal, has not received siting approval by the Peoria County Board.

In summary, I agree that the opposition groups have standing to bring this appeal because the adjusted standard is a quasi-legislatively created environmental regulation.  I conclude the Board's decision is arbitrary and capricious because the Board made no factual findings

46

regarding the requirements of either section 104.426 of Title 35 of the Code (35 Ill. Adm. Code §104.426) or section 720.122(a) or (b) of Title 35 of the Code (35 Ill. Adm. Code §§720.122(a), (b)) for this court to review. Additionally, the Board improperly relieved PDC of their regulatory burden of proof relating to the section 27(a) factors of the Act. 415 ILCS 5/27(a) (West 2008). Consequently, I would reverse the Board's order granting PDC's petition for an individual adjusted standard as both arbitrary and capricious.

Alternatively, I respectfully suggest the Board's order cannot be confirmed on this record and would remand the matter to the Board with directions to enter specific findings of fact regarding PDC's burden to prove the section 27(a) factors as well as the requirements of sections 720.122(a) and (b).