2015 IL App (4th) 130443

NOS. 4-13-0443, 4-13-0448 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 27, 2015
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| E.O.R. ENERGY, LLC,<br>            Petitioner,<br>                        v.<br>THE POLLUTION CONTROL BOARD, THE PEO-<br>PLE OF THE STATE OF ILLINOIS, and AET EN-<br>VIRONMENTAL, INC.,<br>            Respondents.<br>_____<br><br>AET ENVIRONMENTAL, INC.,<br>            Petitioner,<br>                        v.<br>THE POLLUTION CONTROL BOARD, THE PEO-<br>PLE OF THE STATE OF ILLINOIS, and E.O.R. EN-<br>ERGY, LLC,<br>            Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Direct Appeal from<br>the Order of the<br>Illinois Pollution Control Board<br>No. PCB 2007-095 |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices Holder White and Appleton concurred in the judgment and opinion.

**OPINION**

¶ 1        These consolidated appeals involve questions of jurisdiction and procedure in vio-

lation-enforcement proceedings before the Illinois Pollution Control Board (Board) under the

Environmental Protection Act (Environmental Act) (415 ILCS 5/1 to 58.17 (West 2004)).  In

March 2007, the Illinois Environmental Protection Agency (EPA) charged two companies, peti-

tioners, E.O.R. Energy, LLC (EOR), and AET Environmental, Inc. (AET) (collectively, the

companies), with violations of the Environmental Act and its associated regulations.  Specifical-

ly, the EPA alleged in its complaint that EOR and AET transported hazardous-waste acid into

Illinois, where EOR stored the waste before disposing of it through injection into EOR's industrial wells in Sangamon and Christian counties. In June 2012, the EPA filed motions for summary judgment. In response, the companies—for the first time in these proceedings—argued that the acid material at issue was not a waste, but instead was used to treat EOR's wells to aid in petroleum extraction. Therefore, the companies claimed, their conduct fell within the exclusive regulatory jurisdiction of the Illinois Department of Natural Resources (DNR) under the Illinois Oil and Gas Act (Oil and Gas Act) (225 ILCS 725/1 to 28.1 (West 2004)). The Board rejected that argument and granted summary judgment for the EPA, concluding that the DNR's regulatory authority over the injection of fluids into oil-and-gas-related wells does not encompass the injection of hazardous waste. Instead, hazardous-waste regulation is within the exclusive province of the EPA. The Board imposed sanctions of $60,000 against AET and $200,000 against EOR.

¶ 2　　　The companies appeal directly to this court pursuant to section 41(a) of the Environmental Act (415 ILCS 5/41(a) (West 2004)), arguing that (1) the EPA failed to plead facts sufficient to establish jurisdiction; (2) the EPA and Board had no jurisdiction; and (3) even if the EPA and Board had jurisdiction, the record fails to support the Board's grant of summary judgment.

¶ 3　　　To the extent the companies challenge the sufficiency of the EPA's pleadings, we conclude they forfeited that argument by answering the complaint and failing to raise a timely objection. We further conclude that (1) the EPA and Board had jurisdiction and (2) the undisputed facts established that the companies violated the Environmental Act, as alleged in the EPA's complaint. Accordingly, we affirm the Board's grant of summary judgment.

¶ 4　　　　　　　　　　　　I. BACKGROUND

¶ 5　　　Initially, we note that the companies vigorously contest many of the Board's fac-

tual findings. However, because the companies' multiple procedural defaults affected the factual record that was before the Board on summary judgment, we begin with the procedural history of this case before turning to the undisputed facts.

¶ 6                           A. Procedural Background

¶ 7                           1. *The EPA's March 2007 Complaint*

¶ 8         In count I, the EPA alleged that AET and EOR violated section 21(e) of the Environmental Act (415 ILCS 5/21(e) (West 2004)) by transporting hazardous wastes into Illinois for storage and disposal at a site that did not meet the Environmental Act's requirements.

¶ 9         In count II, the EPA alleged that EOR violated sections 21(e) and (f)(1) of the Environmental Act (415 ILCS 5/21(e), (f)(1) (West 2004)) by storing, disposing, "and/or" abandoning hazardous wastes at a site that did not meet the Environmental Act's requirements, thereby conducting a hazardous-waste storage operation without a Resource Conservation and Recovery Act of 1976 (RCRA) permit.

¶ 10        In count III, the EPA alleged that EOR violated (1) sections 703.121(a) and (b) of Title 35 of the Illinois Administrative Code (Administrative Code) (35 Ill. Adm. Code 703.121(a), (b) (2003)), (2) section 704.105(a)(2) of Title 35 of the Administrative Code (35 Ill. Adm. Code 704.105(a)(2) (2006)), and (3) section 21(f)(2) of the Environmental Act (415 ILCS 5/21(f)(2) (West 2004)) by failing to apply for or acquire an RCRA permit before storing hazardous waste at its site.

¶ 11        In count IV, the EPA alleged that EOR violated multiple provisions of title 35 of the Administrative Code, thereby violating section 21(f)(2) of the Environmental Act (415 ILCS 5/21(f)(2) (2004)), by failing to follow proper procedures, take all necessary precautions, and keep and maintain all appropriate records regarding the management of the hazardous-waste

acid.

¶ 12     Last, in count V, the EPA alleged that EOR violated section 704.121 of Title 35 of the Administrative Code (35 Ill. Adm. Code 704.121 (2006)), thereby violating section 12(g) of the Environmental Act (415 ILCS 5/12(g) (West 2004)), by injecting hazardous waste acid into EOR's wells without having an Underground Injection Control (UIC) permit and failing to comply with the listed requirements of section 704.203 of Title 35 of the Administrative Code (35 Ill. Adm. Code 704.203 (2006)).

¶ 13     In April 2007, the Board accepted the EPA's complaint for hearing.  In June 2007, the companies—through corporate officers who were not attorneys—filed separate answers to the EPA's complaint.  In October 2007, after a Board hearing officer required the companies to hire an attorney, both companies refiled answers to the complaint through their mutual attorney, David O'Neill.  Neither company challenged (1) the EPA's or the Board's jurisdiction or (2) the sufficiency of the EPA's complaint.

¶ 14     In January 2008, O'Neill withdrew from the case.

¶ 15               2. *The EPA's Requests To Admit Facts*

¶ 16     In March 2008, the EPA served AET with a request to admit facts that set forth 138 separate factual allegations.  In April 2008, Lori DeVito, AET's owner, who was not an attorney, filed an appearance and a response to the EPA's request to admit facts.

¶ 17     In January 2009, the EPA served EOR with a request to admit facts that set forth 165 separate factual allegations.  In February 2009, attorney Diane F. O'Neill entered her appearance on behalf of AET and EOR.  (The record does not reveal what relation, if any, exists between David O'Neill and Diane O'Neill.)  Later that month, EOR filed an unsigned and unsworn response to the EPA's request to admit facts.  The response stated, in part, "[EOR], arguing on its

own behalf, herein responds to the [EPA's] Request to Admit Facts." (Although the final page of the response listed Diane F. O'Neill's name and contact information, the signature line above her name was blank and the document was not notarized.) In March 2010, Diane O'Neill withdrew from the case.

¶ 18 In August 2010, the EPA filed motions to deem facts admitted against both companies. In its motions, the EPA cited the Board's procedural rules, which provided that (1) corporations must appear before the Board only through licensed attorneys (35 Ill. Adm. Code 101.400(a)(2), amended at 31 Ill. Reg. 11610 (eff. Nov. 21, 2007)) and (2) a party's failure to respond to a request to admit facts by timely serving upon the requesting party "a sworn statement denying specifically the matters of which admission is requested" results in the matters of fact being admitted (35 Ill. Adm. Code 101.618(f), amended at 31 Ill. Reg. 11610 (eff. Nov. 21, 2007)). The EPA argued that because neither AET nor EOR provided a sworn statement from a licensed attorney in response to the requests to admit, the facts should be deemed admitted. Neither company responded in any form to the EPA's motions to deem facts admitted. In September 2010, the Board granted the EPA's motions to deem facts admitted.

¶ 19 3. *The EPA's Motions for Summary Judgment*

¶ 20 In June 2012, the EPA filed separate motions for summary judgment against AET and EOR. In addition to the facts that the Board deemed admitted in its September 2010 ruling, the EPA's motions for summary judgment relied upon numerous other documentary exhibits.

¶ 21 Among the EPA's exhibits was an affidavit completed by Richard Johnson, an EPA regional manager who conducted the EPA investigation into the companies' alleged violations of the Environmental Act. Johnson stated that his investigation included multiple site inspections and interviews with witnesses. Johnson attached to his affidavit (1) a 10-page report

- 5 -

from his November 2004 inspection of the waste-disposal site; (2) a 58-page "Criminal Technical Report" from the National Enforcement Investigations Center (NEIC) of the United States Environmental Protection Agency (USEPA), which was completed as part of a federal investigation into the companies' conduct; and (3) a 42-page report from Johnson's April 2005 inspection of the waste-disposal site, which included 34 pages of photographs, maps, diagrams, charts, and permitting records.

¶ 22    Neither AET nor EOR moved to strike Johnson's affidavit, the attached reports, or any of the EPA's other supporting exhibits.

¶ 23                    B.  The Undisputed Facts

¶ 24    Having reviewed the procedural history leading up to summary judgment, we now set forth the undisputed facts of record.  Before doing so, however, we note that the EPA's requests to admit contain several seemingly inconsistent factual allegations.  For example, the EPA's request to admit facts served upon EOR contains the following factual assertions:

> "60.  EOR paid Luxury Wheels for the acid material.
>
> 61.  EOR paid AET for the acid material.
>
> 62.  EOR paid nothing for the acid material.
>
> 63.  EOR paid to ship the acid material from Colorado to
>
> Illinois.
>
> 64.  Luxury Wheels paid to ship the acid material from
>
> Colorado to Illinois."

¶ 25    When the Board granted the EPA's motion to deem facts admitted, its doing so resulted in a blanket admission of *all the facts* contained in both of the EPA's requests to admit. Obviously, if two or more of those admitted facts cannot logically coexist as true, those particu-

- 6 -

lar facts cannot be considered undisputed. However, to the extent that we can logically reconcile a combination of admitted facts, we will construe such facts as undisputed. For example, it is logically possible that *both* EOR and Luxury Wheels paid for the acid material to be shipped from Colorado to Illinois. It is not possible, however, that EOR paid AET or Luxury Wheels for the acid material and *also* paid nothing for the acid material. Given these admissions, we will consider it an undisputed fact that EOR paid to ship the acid material from Colorado to Illinois and a disputed fact whether EOR paid Luxury Wheels or AET for the acid material. The companies argue on appeal that the seemingly inconsistent facts must be construed against the EPA as the party moving for summary judgment. However, as is true of the example just given, we conclude that none of the seemingly inconsistent or contradictory facts in the EPA's requests to admit are material to the ultimate determination of liability in this case. Accordingly, we will not attempt to further reconcile—or even discuss—irreconcilable facts that are not material to the issues before us in these appeals.

¶ 26                          1. *The Companies and the Illinois Wells*

¶ 27          AET specializes in the logistics of transportation, storage, and disposal of hazardous waste generated by third-party companies. EOR is an energy company involved in petroleum production. The companies share an office building in Denver. Arthur Clark, a corporate officer of EOR, also works for AET. Clark is married to DeVito, who, as already mentioned, owns AET.

¶ 28          EOR holds the lease to two oil fields in Illinois, on which it operates oil, brine-injection, and natural-gas wells. The first field, known as Rink-Traux, is on the northern edge of Lake Sangchris in Christian County. The second field, known as Galloway, is at the junction of Galloway Road and Cotton Hill Road, just northeast of the village of Pawnee in Sangamon

County.

¶ 29                    2. *The Luxury Wheels Incident*

¶ 30          In July 2002, a hazardous-materials team from the fire department of Grand Junction, Colorado, responded to an incident at Luxury Wheels, a company that produced custom chrome automobile wheels. A 1,500-gallon tank of industrial acid—which consisted of phosphoric, nitric, glycolic, and fluoroboric acids mixed with a product known as Alum Etch-G—was overheating, fuming, and producing a large orange-brown cloud. The fire department successfully cooled and stabilized the acid by adding large amounts of ice to the tank. After eliminating the emergency, the fire department left it up to Luxury Wheels to arrange clean up.

¶ 31                    3. *AET Takes Custody of the Acid Material*

¶ 32          The day after the fire department responded to the incident, Luxury Wheels hired AET to remove and dispose of the acid material. AET obtained eight new 275-gallon plastic storage containers, known as totes, which it used to transport the acid material away from Luxury Wheels.

¶ 33          AET shipped the acid-filled totes to Arvada Treatment Center (Arvada) in Arvada, Colorado, for disposal. As part of the shipment process, AET created a "waste profile" that listed the acid material as "Aluminum Etch (Fluoroboric Acid, Glycolic Acid) that was generated by the etching of aluminum prior to nickel plating." AET also created a "hazardous waste manifest," which described the acid material as corrosive and reactive hazardous waste. Arvada rejected the totes because the acid material was reacting and "off-gassing," emitting a red or orange gas.

¶ 34          After Arvada rejected the acid material, AET prepared another waste profile to be used in delivering the material to Safety Kleen, a disposal company in Deer Trail, Colorado.

That waste profile listed the acid material as "spent aluminum etchant" and "waste byproduct from process."  Safety Kleen also rejected the totes of acid.

¶ 35    After Arvada and Safety Kleen refused to dispose of the acid material, AET placed the totes in a semitrailer at its transfer facility.  Because the acid material was producing gas, the lids of the totes were left slightly open and the semitrailer was left open during the daytime.  A fan was placed in the semitrailer to vent the gas.  While at the transfer facility, one or more of the totes attained a temperature sufficient to melt the container.  Clark—who oversaw the storage of the acid material at AET's facility—directed an AET employee to further dilute the acid with water and other materials.  After dilution, the acid material filled 12 totes.

¶ 36    AET contacted Vickery Environmental, Inc. (Vickery), to discuss disposal of the acid material.  In anticipation of sending the material to Vickery, AET prepared a third waste profile, which described the material as a "clear liquid that is a hazardous waste (40 C.F.R. 261)."  Although AET never sent the acid material to Vickery for disposal, a representative of Vickery suggested disposing of the material through deep-well injection.  Clark and James Hamilton (also an EOR corporate officer) decided to ship the acid material from AET's Colorado facility to EOR's wells in Illinois.

¶ 37    4. *Shipment of the Totes to Illinois*

¶ 38    On August 30, 2002, AET and EOR shipped the totes of acid from AET's warehouse in Denver to a facility located near EOR's oil fields and the village of Pawnee in Sangamon County.  That facility was owned by a company known as Kincaid P & P (Kincaid).  Kincaid employed two workers, Rick Wake and Charles Geary, whom EOR paid to maintain EOR's wells.  A bill of lading accompanying the shipment of acid material listed Luxury Wheels as the shipper, SLT Express as the carrier, and Kincaid as the consignee.

¶ 39                              5. *Storage of the Totes at the Kincaid Facility*

¶ 40          Upon arriving in Illinois, the totes were unloaded and placed in a structure owned by Kincaid. The structure, which was not entirely protected from the outside weather, lacked (1) electricity, (2) heating, (3) a containment structure to collect the acid material in the event of a spill, (4) a fence, and (5) posted warnings that the structure contained hazardous waste. For a period of time between August 2002 and November 2004, bags of hydrated lime were stored on pallets next to the totes of acid material. The paper bags eventually deteriorated and lime spilled onto the ground inside the structure. Hydrated lime is a strong base that would react violently if it made contact with acid. EOR did not instruct Wake or Geary to separate the totes of acid from the lime, nor did EOR inform Wake or Geary that the totes contained hazardous waste.

¶ 41                              6. *Injection of the Acid Material Down EOR's Wells*

¶ 42          At some point prior to early 2004, EOR instructed Wake and Geary to inject the acid material into EOR's wells on the Rink-Traux and Galloway fields. Clark told Wake and Geary that (1) the totes contained a "light grade acid" and (2) they should "keep it out of their eyes and wash it off if they get it on them."

¶ 43          Wake and Geary injected the acid material down the wells by fabricating a hose fitting capable of connecting the totes with the fittings at the top of the wells. After loading a tote into the bed of a pickup truck, Wake and Geary would drive from the storage structure to a well. They would then connect the tote to the well and pump the acid material down the well. Over a three-to-four-month period, Wake and Geary discharged approximately 8 1/2 totes of acid material down EOR's wells.

¶ 44          EOR was aware that Wake and Geary were injecting the acid material into the Rink-Traux and Galloway wells. In January 2004, Hamilton telephoned Geary at his home and

instructed him to (1) discharge all the remaining acid material down EOR's wells as soon as possible and (2) rinse out the remaining totes.

¶ 45                                      7. *The Federal Investigation*

¶ 46          In early February 2004, the USEPA and the NEIC (the USEPA's forensic-investigations division) served a search warrant and conducted sampling activities at the Kincaid site.  (We note that the record does not reveal how federal or state authorities learned of the companies' activities relating to the acid material.)  At the time the search warrant was executed, the 12 totes were still inside the structure.  Three of the totes were full of the acid material and one tote was partially full.  The remaining eight totes contained residue from the acid material.  Liquid samples from the full and partially full totes revealed that the acid material contained greater than 5 mg/L of leachable chromium.

¶ 47                                      8. *Johnson's Investigation*

¶ 48          In November 2004, Johnson inspected the Kincaid site.  Prior to his inspection, Johnson reviewed EPA records and determined that the Kincaid site was not a hazardous-waste-storage or disposal facility and had never been issued an RCRA permit to serve as a hazardous-waste-management facility.  At the Kincaid site, Johnson interviewed Wake, who stated that Hamilton directed Wake and Geary to discharge the acid into the wells.  Following his November 2004 inspection, Johnson received a copy of the NEIC report detailing the results of the testing performed at the Kincaid site.

¶ 49          In April 2005, Johnson reinspected the Kincaid site and discovered that all 12 totes were gone.  Johnson again met with Wake, who showed Johnson a "uniform hazardous waste manifest" showing the shipment of 1,000 gallons of "corrosive and toxic hazardous waste" from the Kincaid site to SET Environmental, Inc., in Houston, Texas, five days earlier.  A "Land

Disposal Restriction" notice accompanying the manifest indicated that the waste exhibited the hazardous-waste characteristics for corrosivity and "Toxicity Characteristic Leaching Procedure (TCLP) chrome."

¶ 50                              C. The Board's Grant of Summary Judgment

¶ 51                                      1. *EOR*

¶ 52          EOR never responded to the EPA's motion for summary judgment. On September 6, 2012, the Board granted summary judgment against EOR and imposed a civil penalty of $200,000, finding that EOR violated the Environmental Act and its associated regulations, as alleged in the EPA's complaint.

¶ 53          On September 12, 2012, attorney Felipe Gomez entered his appearance on behalf of EOR. (We note that Gomez entered his appearance on behalf of AET in August 2012, before the EPA filed its motions for summary judgment.)

¶ 54          In October 2012, EOR filed a motion to reconsider which, for the first time in these proceedings, challenged (1) the sufficiency of the EPA's complaint and (2) the Board's jurisdiction to impose liability and penalties for counts I and V of the EPA's complaint. Specifically, EOR argued that the wells at issue were "Class II oil-and-gas-related injection wells" governed by the Oil and Gas Act, which fell within the exclusive regulatory jurisdiction of the DNR. According to EOR, it utilized the acid material at issue to "treat" the wells, as is a common practice in the oil and gas industry. (We note that the EPA's request to admit facts also stated that EOR injected the acid material to "treat" the wells. This fact was deemed admitted.)

¶ 55          In January 2013, the Board denied EOR's motion to reconsider. In a 20-page order, the Board considered and rejected EOR's jurisdictional arguments. The Board concluded that although DNR has regulatory authority over Class II injection wells, the Oil and Gas Act did

not grant DNR authority over hazardous waste, even if such waste is injected into Class II wells. Instead, DNR's authority to regulate "waste" injected into Class II wells is limited under the Oil and Gas Act to the type of field waste produced during oil and gas extraction. See 225 ILCS 725/1 (West 2004) (defining "waste" for purposes of the Oil and Gas Act). The Board noted that the EPA, however, has exclusive regulatory authority over hazardous waste. Further, EOR's failure to respond to the EPA's request to admit facts or motion for summary judgment resulted in an admission that the acid material was a "hazardous waste" within the meaning of the Environmental Act. Accordingly, the Board affirmed its prior order, finding no jurisdictional defect.

¶ 56                                    2. *AET*

¶ 57          In November 2012, AET—through Gomez—filed a response to the EPA's motion for summary judgment. Similar to EOR's motion to reconsider, AET's response challenged the EPA's and the Board's jurisdiction and the sufficiency of the EPA's complaint. In January 2013, the Board rejected AET's arguments and found that the uncontested facts established AET's liability under count I of the complaint. The Board granted summary judgment for the EPA and imposed a penalty of $60,000 against AET.

¶ 58          In April 2013, the Board denied (1) AET's motion to reconsider and (2) EOR's second motion to reconsider.

¶ 59          These appeals followed. We consolidated the appeals on the parties' joint motion.

¶ 60                              II. ANALYSIS

¶ 61          The companies argue that (1) the EPA failed to plead facts sufficient to establish jurisdiction; (2) the EPA and Board had no jurisdiction; and (3) even if the EPA and the Board had jurisdiction, the record fails to support the Board's grant of summary judgment. We address these arguments in turn.

¶ 62                                        A. Sufficiency of the EPA's Complaint

¶ 63          The companies contend that the EPA failed to plead "ultimate facts" sufficient to establish the jurisdiction. We conclude that this challenge to the EPA's complaint is forfeited.

¶ 64          The Board's rules state that "[a]ll motions to strike, dismiss, or challenge the sufficiency of any pleading filed with the Board must be filed within 30 days after the service of the challenged document, unless the Board determines that material prejudice would result." 35 Ill. Adm. Code 101.506, amended at 29 Ill. Reg. 19666 (eff. Nov. 21, 2005). In this case, the companies did not object to the sufficiency of the EPA's complaint until 5 1/2 years after it was filed. Instead, the companies answered the complaint in October 2007 and responded to each allegation. Accordingly, we conclude that the companies forfeited their objections to the sufficiency of the EPA's complaint.

¶ 65          In so concluding, we note that—unless otherwise specified—procedural rules governing administrative proceedings should generally be interpreted and applied the same as similar rules governing judicial proceedings. It is a well-established rule of civil practice in this state that a respondent forfeits any objection to the sufficiency of the complaint by filing an answer. See, *e.g.*, *Fox v. Heimann*, 375 Ill. App. 3d 35, 41, 872 N.E.2d 126, 133 (2007) ("[W]here a defendant files an answer to a complaint, any defect in the pleading is [forfeited]."). Accordingly, we see no reason why the companies' failure to abide by section 101.506 of title 35 of the Administrative Code should result in anything less than forfeiture of their objection to the sufficiency of the EPA's complaint.

¶ 66                                        B. The EPA's and the Board's Jurisdiction

¶ 67          The companies argue that the EPA and the Board lacked jurisdiction because (1) the acid material shipped into Illinois, stored at the Kincaid structure, and injected into EOR's

wells was not "waste" but, instead, "product"; and (2) only the DNR has jurisdiction to regulate injections into Class II wells. The Board rejected these contentions, as do we.

¶ 68                                    1. *Standard of Review*

¶ 69          As creatures of statute, administrative agencies—such as the EPA and the Board—have only the powers that their enabling statute confers. *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 362 Ill. App. 3d 652, 655-56, 840 N.E.2d 704, 708 (2005). "A decision rendered by an administrative agency which lacks jurisdiction over the parties or the subject matter, or which lacks the inherent power to make or enter the decision involved, is void and may be attacked at any time or in any court, either directly or collaterally." *Board of Education of the City of Chicago v. Board of Trustees of the Public Schools Teachers' Pension & Retirement Fund of Chicago*, 395 Ill. App. 3d 735, 739, 917 N.E.2d 527, 531 (2009).

¶ 70          "The determination of the scope of the agency's power and authority is a judicial function and is not a question to be finally determined by the agency itself." *County of Knox ex rel. Masterson v. Highlands, L.L.C.*, 188 Ill. 2d 546, 554, 723 N.E.2d 256, 262 (1999). The scope of an administrative agency's jurisdiction under its enabling statute is a question of law, which we review *de novo*. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 532, 870 N.E.2d 273, 293 (2006).

¶ 71                          2. *Relevant Provisions of the Environmental Act*

¶ 72          The General Assembly has vested the EPA with authority to investigate violations of the Environmental Act and take summary enforcement action. 415 ILCS 5/4 (West 2004). The Board has authority to adopt regulations and conduct proceedings under the Environmental Act. 415 ILCS 5/5(b)-(d) (West 2004). The Board found that AET violated section 21(e) of the Environmental Act and EOR violated sections 21(e), (f)(1), and (f)(2) and section 12(g) of the

Environmental Act.

¶ 73        Section 21 of the Environmental Act provides, in pertinent part, that no person

shall:

> "(e) Dispose, treat, store or abandon any waste, or transport
>
> any waste into this State for disposal, treatment, storage or aban-
>
> donment, except at a site or facility which meets the requirements
>
> of this Act and of regulations and standards thereunder.
>
>     (f) Conduct any hazardous waste-storage, hazardous waste-
>
> treatment or hazardous waste-disposal operation:
>
>         (1) without a RCRA permit for the site issued by the
>
>     Agency under subsection (d) of Section 39 of this Act, or in
>
>     violation of any condition imposed by such permit, includ-
>
>     ing periodic reports and full access to adequate records and
>
>     the inspection of facilities, as may be necessary to assure
>
>     compliance with this Act and with regulations and stand-
>
>     ards adopted thereunder; or
>
>         (2) in violation of any regulations or standards
>
>     adopted by the Board under this Act[.]"  415 ILCS 5/21(e),
>
>     (f)(1)-(2) (West 2004).

The Environmental Act defines "waste" as "any garbage, sludge from a waste treatment plant,

water supply treatment plant, or air pollution control facility or other discarded material, includ-

ing solid, liquid, semi-solid, or contained gaseous material resulting from industrial, commercial,

mining and agricultural operations, and from community activities."  415 ILCS 5/3.535 (West

2004).  "Hazardous waste" is defined as follows:

> "[A] waste, or combination of wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may cause or significantly contribute to an increase in mortality or an increase in serious, irreversible, or incapacitating reversible, illness; or pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed, and which has been identified, by characteristics or listing, as hazardous pursuant to Section 3001 of the [RCRA], P.L. 94-580, or pursuant to Board regulations."  415 ILCS 5/3.220 (West 2004).

¶ 74        Section 12(g) of the Environmental Act provides, in pertinent part, that no person shall:

> "Cause, threaten or allow the underground injection of contaminants without a UIC permit issued by the [EPA] under Section 39(d) of this Act, or in violation of any term or condition imposed by such permit, or in violation of any regulations or standards adopted by the Board or of any order adopted by the Board with respect to the UIC program."  415 ILCS 5/12(g) (West 2004).

A "contaminant" is broadly defined as "any solid, liquid, or gaseous matter, any odor, or any form of energy, from whatever source."  415 ILCS 5/3.165 (West 2004).

¶ 75                            3.  *The Acid Material at Issue*

¶ 76        The companies contend that the acid material at issue was not a "waste" or "haz-

ardous waste" because it was neither "used" nor "discarded" before EOR injected it into the wells. However, we agree with the Board's conclusion that the undisputed evidence proved otherwise.

¶ 77 Luxury Wheels paid AET to remove the acid material from its facility after the material underwent an uncontrolled and accidental chemical reaction that required an emergency response from the hazardous-materials team of the Grand Junction fire department. AET prepared a "waste material profile" and a "hazardous waste manifest" for the material. On the waste-material profile submitted to Arvada, the box for "unused product or chemical" is left unchecked. The hazardous-waste manifest listed the material as corrosive and reactive hazardous waste. The waste material profile submitted to Safety Kleen described the material as "spent aluminum etchant" generated by "etching of aluminum wheels."

¶ 78 The companies argue, however, that the generator's (Luxury Wheels) intent does not control the determination of whether the material was "used" or "discarded." Instead, the companies assert that because EOR was able to make use of the acid material by injecting it into wells for a purpose related to petroleum extraction, the material was neither "used" nor "discarded." The undisputed evidence rebuts this claim. After several unsuccessful attempts to dispose of the material at waste-disposal sites in Colorado, AET and EOR decided to ship the material to Illinois so that it could be injected down EOR's wells. Even if EOR injected the acid material into its wells to aid in petroleum extraction, this particular acid material was a hazardous waste under section 3.220 of the Environmental Act. Although we do not doubt that petroleum companies sometimes inject acid into their wells for purposes related to petroleum extraction, the record contains no evidence to suggest that the injection of *hazardous-waste* acid is a typical activity that falls within the regulatory parameters of the Oil and Gas Act.

¶ 79          Further rebutting the companies' claim is the fact that most of the acid material (seven full totes consisting of 1,925 gallons) was discharged into a "salt water disposal well" on the Rink-Traux field, according to Johnson's unrebutted affidavit. Only 340 gallons were discharged into oil or gas wells. Even more telling is the fact that five days prior to Johnson's second inspection of the Kincaid site, EOR paid to have 1,000 gallons of "corrosive and toxic hazardous waste" shipped from the Kincaid site to a waste-disposal site in Houston, Texas. If the acid material was actually used in a lawful manner for the treatment of EOR's petroleum wells, the companies have not even attempted to explain why most of the material was either injected into a salt-water disposal well or sent to Texas for disposal. The undisputed evidence leaves no genuine issue of material fact as to whether the acid material was both a "waste" and a "hazardous waste" as defined by the Environmental Act.

¶ 80          Because the acid material was both a "waste" and a "hazardous waste" within the meaning of the Environmental Act, the EPA and the Board properly exercised jurisdiction over the companies' activity *vis-à-vis* the acid material.

¶ 81                                4. *The Wells at Issue*

¶ 82          The companies further contend that the EPA and the Board had no jurisdiction because the acid material was injected into Class II wells, which fall within the exclusive regulatory jurisdiction of the DNR under the Oil and Gas Act. We disagree.

¶ 83          The General Assembly has created a comprehensive statutory structure for the regulation of underground injection of materials into wells in Illinois. This program—commonly known as the Illinois UIC program—was promulgated with federal approval pursuant to the federal UIC program, which allows states the option of implementing their own UIC programs that comply with federal standards. 42 U.S.C. § 6904 (2006). The federal UIC program was prom-

ulgated under the Safe Drinking Water Act (SDWA) (42 U.S.C. § 300f *et seq.* (2006)) and, to the extent the program deals with hazardous waste, the RCRA (42 U.S.C. § 6901 *et seq*. (2006)).

¶ 84 Section 4(l) of the Environmental Act (415 ILCS 5/4(l) (West 2004)) designates the EPA as implementing agency for all purposes of the SDWA, except for section 300h-4 of the SDWA, which provides the authority for federally approved state programs relating to "(1) the underground injection of brine or other fluids which are brought to the surface in connection with oil or natural gas production or natural gas storage operations, or (2) any underground injection for the secondary or tertiary recovery of oil or natural gas." 42 U.S.C. § 300h-4 (2006). As reflected by this jurisdictional carve-out in section 4(l) of the Environmental Act, Illinois's package of UIC-related statutes and regulations submitted to the federal government for approval provided that Class II wells—known as "oil-and-gas-related-injection wells"—would be regulated by the DNR under the Oil and Gas Act. See 40 C.F.R. § 147.701 (2004) (approving and adopting Illinois' proposed UIC program for Class II wells). The EPA, on the other hand, is vested with authority over hazardous-waste injection wells (Class I and Class IV wells). See 35 Ill. Adm. Code 730.105 (2012) (classifying the six types of injection wells based upon the types of materials injected).

¶ 85 Class II wells are defined as wells

"that inject[] any of the following types of fluids:

(1) Fluids that are brought to the surface in connection with conventional oil or natural gas production and which may be commingled with wastewaters from gas plants that are an integral part of production operations, unless those waters are classified as a hazardous waste at the

- 20 -

time of injection;

(2) Fluids that are used for enhanced recovery of oil or natural gas; and

(3) Fluids that are used for storage of hydrocarbons that are liquid at standard temperature and pressure." 35 Ill. Adm. Code 730.105(b) (2012).

¶ 86 The companies assert that the wells at issue in this case fell within the DNR's exclusive regulatory jurisdiction because the DNR issued Class II UIC permits for the wells in the late 1990s. However, the answer to the jurisdictional question presented does not depend upon how the wells were classified at some point in time in the past. Instead, the EPA's and the Board's authority to regulate the activity in this case originated from the type of injections that actually took place, which the Board concluded were not authorized Class II injections.

¶ 87 The Oil and Gas Act provides the DNR authority only over Class II injections into Class II injection wells. Section 8b of the Oil and Gas Act provides that "[n]o person shall drill, convert or deepen a well for the purpose of disposing of oil field brine or for using any enhanced recovery method in any underground formation or strata without first securing a permit therefor." 225 ILCS 725/8b (West 2004). Section 6(2) of the Oil and Gas Act, which sets forth the DNR's power to hold a hearing on a UIC permit application, refers to a "person desiring or proposing to drill, deepen or convert any well *** for the disposal of salt water, brine, or other oil or gas field wastes." 225 ILCS 725/6(2) (West 2004). Section 1 of the Oil and Gas Act provides that " '[w]aste' means 'physical waste' as that term is generally understood in the oil and gas industry." 225 ILCS 725/1 (West 2004). We cite these provisions of the Oil and Gas Act to illustrate that the DNR's regulatory power under the UIC program is clearly limited to the injection of fluids

associated with oil and gas extraction (known as Class II fluids (62 Ill. Adm. Code 240.10, amended at 35 Ill. Reg. 13281 (eff. July 26, 2011))). The DNR's own regulations explicitly state that only Class II fluids may be injected into Class II wells under the UIC program. 62 Ill. Adm. Code 240.750(i), amended at 35 Ill. Reg. 13281 (eff. July 26, 2011).

¶ 88        The type of hazardous-waste acid at issue in this case, which was produced specially for etching aluminum automobile wheels and contained traceable amounts of leachable chromium, was not a Class II fluid that the DNR was authorized to regulate under the UIC program or the Oil and Gas Act. Instead, because the acid material in this case clearly fell within the Environmental Act's definition of "hazardous waste," the EPA and the Board had jurisdiction over the injection. It does not matter for jurisdictional purposes that the hazardous waste was injected into Class II wells.

¶ 89        We note that the companies' jurisdictional argument relies heavily upon section 45(a) of the Environmental Act (415 ILCS 5/45(a) (West 2004)), which provides, in pertinent part, as follows:

> "Nothing in this Act shall be construed to limit or supersede the
> provisions of the Illinois Oil and Gas Act and the powers therein
> granted to prevent the intrusion of water into oil, gas or coal strata
> and to prevent the pollution of fresh water supplies by oil, gas or
> salt water or oil field wastes ***. However, if the [DNR] fails to
> act upon any complaint within a period of 10 working days follow-
> ing the receipt of a complaint by the [DNR], the [EPA] may pro-
> ceed under the provisions of this Act."

¶ 90        The companies assert that the record fails to establish the EPA waited 10 working

days following the DNR's receipt of a complaint before proceeding under the Environmental Act. However, the 10-day provision is a red herring because nothing in section 45(a) of the Environmental Act precluded the EPA or the Board from exercising jurisdiction in this case. In fact, section 45(a) of the Environmental Act supports the Board's determination that it had jurisdiction. As already stated, the DNR has no authority to permit the underground injection of hazardous waste. In carving out a specific area of exclusive jurisdiction for the DNR in section 45(a) of the Environmental Act, the General Assembly saw fit only to grant the DNR exclusive power to "prevent the pollution of fresh water supplies by oil, gas or salt water or oil field wastes." 415 ILCS 5/45(a) (West 2004). Because the acid material in this case did not constitute oil, gas, salt water, or oil field wastes, the EPA's and the Board's exercise of jurisdiction could have done nothing to "limit or supersede the provisions" of the Oil and Gas Act or the powers therein granted to the DNR.

¶ 91    The unpermitted injection of hazardous-waste acid into EOR's wells (1) did not constitute a Class II injection authorized by the Oil and Gas Act or its associated regulations and; (2) therefore, fell within the EPA's and the Board's jurisdiction to enforce the provisions of the Environmental Act regulating hazardous waste.

¶ 92                    C. The Board's Grant of Summary Judgment

¶ 93    Finally, the companies argue that the facts of record were insufficient to support the Board's grant of summary judgment for the EPA. Before we explain why we disagree with this contention, however, we note that EOR forfeited this claim by altogether failing to respond to the EPA's motion for summary judgment. Accordingly, we affirm the Board's grant of summary judgment against EOR as to all counts of the EPA's complaint.

¶ 94    AET contends that because the Board found EOR liable under count I as the ship-

per of the acid material, the "law-of-the-case doctrine" bars AET from also being found liable for the same offense. AET points out that neither the EPA's motion for summary judgment against EOR, nor the Board's order granting that motion, named AET as the "co-transporter" of the acid material. Therefore, AET argues, the Board was barred from finding AET liable under section 21(e) of the Environmental Act. This argument is entirely without merit. The law-of-the-case doctrine "bars relitigation of an issue already decided in the same case." *People v. Tenner*, 206 Ill. 2d 381, 395, 794 N.E.2d 238, 247 (2002). The doctrine does not, however, prohibit a finding that two parties are jointly liable for violating a statute. AET fails to explain how the Board's finding that EOR was liable under section 21(e) of the Environmental Act necessarily precluded the Board from finding AET liable as well.

¶ 95        We agree with the Board's finding that the undisputed facts established AET's liability under section 21(e) of the Environmental Act, which provides, in pertinent part, that no person shall "transport any waste into this State for disposal, treatment, storage or abandonment, except at a site or facility which meets the requirements of this Act and of regulations and standards thereunder." 415 ILCS 5/21(e) (West 2004). Johnson's affidavit stated, in pertinent part, as follows:

> "[AET] was hired by [Luxury Wheels] to dispose of the
> hazardous waste acid. After several attempts to dispose of the acid
> at various hazardous waste disposal facilities, AET transferred the
> hazardous waste acid to [EOR]. AET and EOR shipped the haz-
> ardous waste acid to the Kincaid P & P site.
>
>        *** Prior to my site inspection, I performed a review of Il-
> linois EPA records and discovered that the Kincaid P & P site is

not a hazardous waste storage or disposal facility and has never

been issued a RCRA permit granting it permission to serve as a

hazardous waste management facility."

¶ 96        Standing alone, the factual assertions in Johnson's affidavit were sufficient to establish AET's liability under section 21(e) of the Environmental Act.  AET argues on appeal that many statements in Johnson's affidavit were (1) based largely upon hearsay, (2) unsupported by independent evidence, and (3) factually inaccurate.  However, AET forfeited these objections to Johnson's affidavit by failing to file a motion to strike the affidavit based upon these alleged deficiencies.  "In Illinois, the general rule is the sufficiency of affidavits cannot be tested for the first time on appeal where no objection was made by a motion to strike, or otherwise, in the trial court." *Arnett v. Snyder*, 331 Ill. App. 3d 518, 523, 769 N.E.2d 943, 947 (2001) (citing *Kolakowski v. Voris*, 83 Ill. 2d 388, 398, 415 N.E.2d 397, 402 (1980)).

¶ 97        AET also failed to present any affidavits of its own to rebut Johnson's affidavit (or any of the EPA's other evidence, for that matter).  "When a party moving for summary judgment files supporting affidavits containing well-pleaded facts, and the party opposing the motion files no counteraffidavits, the material facts set forth in the movant's affidavits stand as admitted.  [Citation.]  The opposing party may not stand on his or her pleadings in order to create a genuine issue of material fact. [Citation.]" *Parkway Bank & Trust Co. v. Korzen*, 2013 IL App (1st) 130380, ¶ 49, 2 N.E.3d 1052.  AET's failure to file counteraffidavits resulted in the factual assertions in Johnson's affidavit standing as admitted.  Because those unrebutted factual assertions established AET's liability under section 21(e) of the Environmental Act, we affirm the Board's grant of summary judgment against AET.

¶ 98                          III.  CONCLUSION

¶ 99          For the reasons stated, we affirm the Board's judgment.

¶ 100         Affirmed.