19 November 1999

No. 2--98--1101

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

__________________________________________________________________

THE ENVIRONMENTAL ) Petition for review of order

PROTECTION AGENCY, ) of Pollution Control Board

)

Petitioner-Appellant, )

)

v. ) No. AS97-5

)

THE POLLUTION CONTROL )

BOARD and THE LOUIS BERKMAN )

COMPANY, d/b/a the Swenson )

Spreader Company, )

)

Respondents-Appellees. )

_________________________________________________________________

PRESIDING JUSTICE BOWMAN delivered the opinion of the court:

The Louis Berkman Company, d/b/a the Swenson Spreader Company (Swenson), petitioned the Illinois Pollution Control Board (Board) for an adjusted standard pertaining to its emission of volatile organic material (VOM) pursuant to section 28.1 of the Environmental Protection Act (Act) (415 ILCS 5/28.1 (West 1996)).  The Illinois Environmental Protection Agency (Agency) opposed the petition.  The Board granted Swenson a 10-year adjusted standard with certain conditions.  The Agency appeals the Board's decision and argues that (1) the manifest weight of the evidence showed that Swenson did not need an adjusted standard because it could substantially reduce its VOM emissions by installing a powder coating system; (2) the Board improperly interpreted the term "economic reasonableness"; (3) Swenson failed to establish that installing a powder coating system would be economically unreasonable; and (4) the record as a whole did not support the Board's decision.  We affirm.

Swenson manufactures snow- and ice-control equipment at its plant in Ogle County.  Part of the manufacturing process for many of Swenson's products includes applying one or more coatings of paint.  Generally, Swenson applies a primer and at least one coat of paint to its products, with the exception of its stainless steel products and its "all purpose bodies," which receive only a primer coat.

Section 215.204 of the Illinois Administrative Code (Code) governs VOM emissions from manufacturing plants.  35 Ill. Adm. Code §215.204 (1996).  VOM refers to a wide range of organic carbon compounds that participate in atmospheric photochemical reactions.  35 Ill. Adm. Code §211.7150 (1996).  The parties agree that section 215.204(j)(2) of the Code (35 Ill. Adm. Code §215.204(j)(2) (1996)) applies to Swenson.  According to that section, VOM emissions from air-dried miscellaneous metal parts and products coatings may not exceed 3.5 pounds per gallon.  35 Ill. Adm. Code §215.204(j)(2) (1996).   Manufacturers that emit less than 25 tons of VOM per year are exempt from this limitation.  35 Ill. Adm. Code §215.206 (1996). 

Swenson considers itself a "job shop" because most of the products it makes are customized to client specifications.  When a customer does not specify a type or brand of paint, Swenson applies one of its standard coatings. Approximately 90% of Swenson's clients are governmental entities, which frequently require specialty coatings on the products they order.  Many of the specialty coatings Swenson uses contain more than 3.5 pounds of VOM per gallon and therefore do not comply with section 215.204(j)(2).

On October 11, 1996, Swenson filed a petition for an adjusted standard pursuant to section 28.1 of the Act.  415 ILCS 5/28.1 (West 1996).  In its petition, Swenson claimed that it could not meet the requirements of section 215.204(j)(2) because many of the coatings its customers specify contain more than 3.5 pounds of VOM per gallon.  Swenson further claimed that coatings that satisfy customer requirements and comply with section 215.204(j)(2) are not available.  On December 11, 1996, the Agency filed an enforcement action against Swenson, alleging violations of section 215.204(j)(2), the same provision from which Swenson sought an adjusted standard.  

The Agency urged the Board to deny the petition for an adjusted standard, arguing that Swenson could reduce its VOM emissions to less than 25 tons per year by powder coating its products instead of using air-dried paints.  If Swenson emitted less than 25 tons of VOM per year, it would qualify for an exemption from the emissions limitation.  35 Ill. Adm. Code §215.206 (1996).  In an effort to settle the enforcement proceeding, Swenson offered to install a powder coating system.  The Agency contended, in the adjusted standard proceeding, that this offer demonstrated that the installation of a powder coating system would be technically and economically reasonable for Swenson.    

The Board held hearings in the adjusted standard proceeding on April 25, 1997, and June 3, 1997.  The Board heard evidence about the feasibility of different abatement methods, including installing a powder coating system, installing an afterburner, and reformulating the paints Swenson uses.  On appeal, the Agency challenges only the Board's findings regarding the installation of a powder coating system.  The following facts, taken from the record, are relevant to this issue.

   Mark Swisher, Swenson's general manager, testified that installing a powder coating system was one option Swenson considered in its efforts to comply with pollution control regulations.  According to Swisher, powder coatings are strong and durable and do not emit VOM.  He thought Swenson's customers would look favorably on powder coatings because of their durability, but it would take time to persuade them to accept powder coatings instead of the paints they normally specify.

Swisher estimated that Swenson could use powder coatings on approximately 70% of its products.  Some products that require a specific primer could not be powder coated.  Swenson would not have the capability to powder coat products larger than 10 feet, because building a system that could accommodate larger parts would cost too much.  Also, certain parts, such as motors and plastic parts, could not be powder coated because they could not withstand the heat generated during the process. 

Swisher testified that a powder coating system would cost approximately $750,000.  He further testified that Swenson would have to construct a new building to house the powder coating system.  The building would cost an additional $750,000, for a total cost of $1.5 million.  Swisher testified that even if Swenson installed a powder coating system, that would not immediately solve its problem with excessive VOM emissions because it would take Swenson's employees some time to learn how to operate the system, and it would take "a long time" to convince customers to accept powder coating as an alternative to the coatings they normally specified.

The Board issued an interim opinion and order (Order) granting Swenson an adjusted standard on December 4, 1997.  In its Order, the Board found that compliant specialty coatings were not available to Swenson.  The Board further found that installing a powder coating system was not an economically reasonable compliance alternative.  

The Board arrived at the latter conclusion by comparing Swenson's projected cost per ton of reduced emissions to an average control cost per ton as set forth in the Reasonably Available Control Technology (RACT II) rules.  
RACT II Rules, Ch. 2: Air Pollution
, Ill. Pollution Control Board R. 80--5 (October 5, 1982).  These rules were based on a study performed by the Illinois Institute of Natural Resources, which determined that the average cost, in 1980 dollars, of complying with pollution regulations for companies located in attainment areas would be $1,032 per ton of VOM reduced.  
RACT II Rules
, R. 80--5, slip op. at 19.  The Board accepted Swenson's calculation that the equivalent cost in 1996 dollars was $1,734 per ton.  The Board used this figure as its yardstick for determining the reasonableness of control costs Swenson would have to incur if it installed a powder coating system.  Swenson claimed that if it were to install a $1.5 million dollar powder coating system, its cost would be $29,362 per ton of reduced VOM.  The Agency did not challenge Swenson's calculation.    In part, the Board based its decision to grant an adjusted standard on the substantial difference between the average control cost and the cost to Swenson of installing a powder coating system.  The Board also found that granting Swenson an adjusted standard would not result in environmental or health effects substantially or significantly more adverse than those the Board considered when adopting the regulation of general applicability.  Last, the Board found that an adjusted standard was consistent with federal law.

Swenson requested an adjusted standard that would allow it to use coatings containing 5.0 pounds of VOM per gallon, on a monthly average, for the first year and 4.75 pounds of VOM per gallon thereafter.  The Board granted a modified version of the standard Swenson requested, limiting the adjusted standard to 10 years and allowing Swenson to use coatings that contain, on a monthly average, 4.75 pounds of VOM per gallon.  The Board directed Swenson to submit a plan for complying with the adjusted standard.

Swenson submitted its compliance plan, portions of which the Agency opposed.  The Board issued a final opinion and order on May 7, 1998.  The final opinion and order provided that the adjusted standard would be in effect from May 7, 1998, through May 7, 2008.  As conditions of the adjusted standard, the Board ordered Swenson to do the following: (1) maintain daily records of its VOM emissions; (2) calculate its monthly average of VOM emissions and provide the Agency with an annual summary report of the VOM emissions; (3) calculate its VOM emissions in accordance with federal regulations and maintain records of the VOM content of the coatings it uses; (4) maintain contact with at least three paint vendors a year regarding the availability of coatings that comply with section 215.204(j)(2), test any compliant coatings the vendors provide, and report the test results and the status of its research on using powder coatings to the Agency; (5) apply to the Board to withdraw the adjusted standard if Swenson's research shows that it can technically and economically use compliant coatings or a powder coating system; and (6) apply to the Board to modify the adjusted standard if Swenson changes its production process in a manner that affects its VOM emissions, including installing a powder coating system.

The Agency moved to reconsider the Board's final opinion and order.  The basis of the Agency's motion was that Swenson had filed an application to construct and operate a powder coating system on May 14, 1998.  The Agency argued that the application demonstrated that it was technically and economically feasible for Swenson to use a powder coating system.  The Board denied the motion to reconsider and this appeal followed.

Before considering the merits of the Agency's appeal, we must determine what standard of review to apply to the Board's decision.  It is well established that the Board serves both quasi-judicial and quasi-legislative functions and that different standards of review apply depending on the nature of the Board's function in the underlying proceeding. See 
Environmental Protection Agency v. Pollution Control Board
, 86 Ill. 2d 390, 399-402 (1981).  Quasi-

legislative functions include promulgating rules and regulations (
Granite City Division of National Steel Co. v. Illinois Pollution Control Board
, 155 Ill. 2d 149, 162 (1993)), defining the scope of emissions standards (
Environmental Protection Agency
, 86 Ill. 2d at 400), and placing conditions on variances (
Monsanto Co. v. Pollution Control Board
, 67 Ill. 2d 276, 289-91 (1977)).  Quasi-

legislative determinations are exercises of the Board's rulemaking powers.  The supreme court has instructed that "[w]hen an agency has acted in its rulemaking capacity, a court will not substitute its judgment for that of the agency."  
Granite City
, 155 Ill. 2d at 162.  For this reason, the Board's quasi-legislative decisions will not be overturned unless they are arbitrary and capricious.  
Granite City
, 155 Ill. 2d at 162.   

The Board acts in a quasi-judicial capacity when it determines rights or liabilities in an individual case based on the particular facts of the case.  
American Federation of State, County & Municipal Employees v. Department of Central Management Services
, 288 Ill. App. 3d 701, 711 (1997).  Examples of quasi-judicial acts include granting or denying a variance (
Willowbrook Development Corp. v. Pollution Control Board
, 92 Ill. App. 3d 1074, 1082 (1981)) and reviewing an Agency decision to grant or deny a permit (
Environmental Protection Agency v. Pollution Control Board
, 118 Ill. App. 3d 772, 777 (1983)).  A reviewing court will uphold a quasi-judicial determination unless it is contrary to the manifest weight of the evidence.  
Willowbrook
, 92 Ill. App. 3d at 1082.  When a case involves both quasi-legislative and quasi-judicial functions, the reviewing court should apply both standards of review.  
Environmental Protection Agency
, 86 Ill. 2d at 402; see also 
City of Belvidere v. Illinois State Labor Relations Board
, 181 Ill. 2d 191, 204-05 (1998) (holding that when an administrative agency's decision was a mixed question of fact and law, a reviewing court should apply a "clearly erroneous" standard of review).

Both the Agency and the Board recommend that we apply both standards of review to the Board's decision.  They interpret the Board's decision to grant the adjusted standard as a quasi-judicial act that should be reversed if it is against the manifest weight of the evidence.  On the other hand, they suggest that the Board's interpretation of the applicable regulations, in particular its definition of "economic reasonableness," is a quasi-legislative determination subject to the "arbitrary and capricious" standard of review.    

There are three methods by which an entity can seek relief from a rule of general applicability: variances, adjusted standards, and site-specific regulations. 
 
 Adjusted standards are similar to variances in certain respects.  In proceedings for both variances and adjusted standards, the Board's decisions must be supported by a written opinion with specific findings of fact.  See 415 ILCS 5/28.1(d), 35(a) (West 1996).  Proceedings for both a petition for a variance and a petition for an adjusted standard are adversarial in nature, whereas petitioners for site-specific regulations must follow standard rulemaking procedures.
  See 415 ILCS 5/27, 28 (West 1996).  Furthermore, the Act deems petitions for an adjusted standard "adjudicatory" proceedings.  415 ILCS 5/28.1 (West 1996).  This being said, many aspects of a ruling on a petition for an adjusted standard involve the Board's technical expertise and interpretation of rules, which are quasi-legislative determinations.  See 
Environmental Protection Agency v. Pollution Control Board
, 86 Ill. 2d 390, 400-02 (1981); 
Monsanto Co. v. Pollution Control Board
, 67 Ill. 2d 276, 289-91 (1974).

Here, the Board had to determine whether Swenson established the factors set forth in section 28.1(c).  415 ILCS 5/28.1(c) (West 1996).  Section 28.1(c) provides in relevant part:

"If a regulation of general applicability does not specify a level of justification required of a petitioner to qualify for an adjusted standard, the Board may grant individual adjusted standards whenever the Board determines, upon adequate proof by petitioner, that:

(1) factors relating to that petitioner are substantially and significantly different from the factors relied upon by the Board in adopting the general regulation applicable to that petitioner;

(2) the existence of those factors justifies an adjusted standard;

(3) the requested standard will not result in any environmental or health effects substantially and significantly more adverse than the effects considered by the Board in adopting the rule of general applicability; and

(4) the adjusted standard is consistent with any applicable federal law."  415 ILCS 5/28.1(c) (West 1996).

Thus, in an adjusted-standard proceeding the Board considers facts and circumstances relevant to the petitioner in the context of the factors the Board relied upon when adopting the pertinent rule of general applicability.  These decisions will often call upon the Board's knowledge and interpretation of the relevant regulation of general applicability.   Therefore, we find it appropriate to determine whether the ruling at issue involved an exercise of the Board's technical expertise or an interpretation of a rule or regulation and, consequently, which standard of review applies.

The Agency first argues that Swenson failed to establish that it was entitled to an adjusted standard because it did not prove that its customers would not accept powder coated products, nor did Swenson prove how long it would take to install a powder coating system and get it up and running.  We apply the manifest weight of the evidence standard to this issue, as it involves factual findings that are not dependent upon the Board's expertise.  We note that it is not a reviewing court's function to reconsider the evidence presented to an administrative agency or to make a new determination of the facts.  
Environmental Protection Agency v. Pollution Control Board
, 252 Ill. App. 3d 828, 830 (1993).
  An administrative agency's factual findings are presumed 
prima facie
 true and correct.  
Environmental Protection Agency
, 252 Ill. App. 3d at 830.
  An agency's decision is not against the manifest weight of the evidence if any evidence fairly supports the agency's action.  
Environmental Protection Agency
, 252 Ill. App. 3d at 830.
 

The Agency's first argument is somewhat of a red herring, because Swenson was not required to prove
 the lack of customer acceptance
 or how long it would take to implement a powder coating system
, nor did the Board base its decision on either of these factors.  To satisfy the first two elements of section 28.1(c), Swenson had to show the existence of factors that were substantially and significantly different from those the Board relied on when promulgating the rule of general applicability and show that those factors justified an adjusted standard. See 415 ILCS 5/28.1(c)(1), (c)(2) (West 1996).  In its Order of December 4, 1997, the Board cited the unavailability of compliant coatings and the unreasonable cost of installing a powder coating system as substantially and significantly different factors that justified an adjusted standard.  There is nothing in the Board's Order which suggests that the Board relied on Swenson's customers' reluctance to accept powder coating as a basis for its decision.

Likewise, the Board did not cite the length of time necessary to make a powder coating system operational as a substantially and significantly different factor that justified an adjusted standard.  It is evident, though, that the Board contemplated the time factor and how long it would take for Swenson to achieve compliance when it granted Swenson a 10-year adjusted standard instead of a permanent one, as Swenson requested.  The Board noted that "Swenson's governmental customers may change their specifications. Furthermore, improvements in technology also may eventually enable Swenson to comply with the 3.5 VOM lb./gal limit."   However, the Board did not rely on the length of time it might take Swenson to implement a powder coating system as a reason for its decision.  Thus, the Agency's arguments in this regard do not establish that the Board's decision was contrary to the manifest weight of the evidence.

The Agency does not challenge the Board's finding that the lack of compliant coatings was a substantially and significantly different factor that justified an adjusted standard.  However, it does challenge the second substantially and significantly different factor that the Board found, namely, the unreasonable cost of implementing a powder coating system.  We consider this issue next.

When deciding Swenson's petition for an adjusted standard, the Board had to compare factors relating to Swenson to the factors the Board relied upon when enacting section 215.204(j)(2).  35 Ill. Adm. Code 215.204(j)(2) (1996).  Section 27 of the Act directs:

"In promulgating regulations under this Act, the Board shall take into account the existing physical conditions, the character of the area involved, including the character of surrounding land uses, zoning classifications, the nature of the existing air quality, or receiving body of water, as the case may be, and the technical feasibility and economic reasonableness of measuring or reducing the particular type of pollution."  415 ILCS 5/27 (West 1996).   

The Agency does not dispute that economic reasonableness was a proper factor for the Board to consider, nor does the Agency dispute the cost to Swenson of implementing a powder coating system.  Instead, it argues that the Board's interpretation of "economic reasonableness" was arbitrary and capricious.  The Board's interpretation of the term "economic reasonableness" calls upon its technical expertise and interpretation of applicable regulations and, therefore, is subject to an "arbitrary and capricious" standard of review.   

The supreme court has held that an agency acts in an  arbitrary and capricious manner when it does the following: (1) relies on factors that the legislature did not intend for the agency to consider; (2) entirely fails to consider an important aspect of the problem; or (3) offers an explanation for its decision that runs counter to the evidence or that is so implausible that it cannot be ascribed to a difference in view or the product of agency expertise.  
Greer v. Illinois Housing Development Authority
, 122 Ill. 2d 462, 506 (1988), citing 
Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.
, 463 U.S. 29, 43, 77 L. Ed. 2d 443, 458, 103 S. Ct. 2856, 2866-67 (1983).

The Agency finds fault with the Board's definition of "economically reasonable" because the Board did not factor into its calculation the benefits Swenson allegedly would receive as a result of installing a powder coating system.  Those benefits, according to the Agency, included settling the pending enforcement action against Swenson and improving Swenson's product quality.  

Historically, the Board has employed a cost-benefit analysis in its proceedings, which generally has involved measuring the cost of implementing pollution control technology against the benefit to the public in reducing pollution.  
Environmental Protection Agency v. Lindgren Foundry Co.
, Ill. Pollution Control Bd. Op. 70--1 (September 25, 1970).  The Agency argues that the Board should also take into account benefits that will accrue to the petitioner as a result of implementing control technology.

We agree in theory with the Agency that the Board should take into consideration tangible benefits that have been established with some certainty.  In practice, however, the benefits the Agency claimed Swenson would derive were purely speculative.  Thus, the Board did not err in declining to consider the alleged benefits.  

Mark Swisher testified that, although he thought customers would like powder-coated products, he did not know if or when they would accept powder coating as an alternative to paint.  The Agency faults Swenson for not asking its customers whether they would accept powder coating.  However, even if Swenson did make such inquiries of its customers, it would be impossible at this stage to predict what its customers might do in the future, much less quantify any benefits that Swenson might receive.

     The Agency's argument that settlement of the enforcement proceeding would likely occur and would be favorable to Swenson is also based on an assumption that may or may not be true.  As the Board points out, the Agency assumes that, if the enforcement proceeding does not settle, the Agency will succeed in obtaining a substantial penalty against Swenson.  The Agency also assumes that, if a penalty is imposed, it will exceed the cost of a powder coating system. There is nothing in the record to support these assumptions or to otherwise establish the purported benefits to Swenson with any certainty.  Accordingly, we hold that the Board's interpretation of the term "economic reasonableness" was not arbitrary and capricious.

The Agency's final arguments are that Swenson did not sufficiently establish that a powder coating system would be economically unreasonable and that the record as a whole does not support the Board's finding.  Both arguments rely heavily on Swenson's offer in the enforcement proceeding to install a powder coating system as evidence of economic reasonableness.  The Board  considered this argument and concluded that the mere offer, in another proceeding, to install a powder coating system did not make it economically reasonable.  We agree.  We also agree that Swenson made a sufficient showing that installing a powder coating system would be economically unreasonable.  

According to the uncontested figures Swenson presented, the cost of installing a powder coating system would be more than 15 times the average control cost the Board historically has used to measure reasonableness.  The Agency acknowledges that the Board's use of the "benchmark" figure is appropriate in most cases but argues that the benchmark did not account for the benefits that Swenson would derive from installing a powder coating system.  As we explained, it was not appropriate for the Board to consider the alleged benefits because of their speculative nature.  For this reason, we also reject the Agency's argument that Swenson should have provided evidence of what benefits it might receive if it installed a powder coating system.  Thus, after a careful review, we find that the record supports the Board's decision.

Accordingly, for the reasons stated, we affirm the Illinois  Pollution Control Board's orders of May 7, 1998, and July 23, 1998. 

Affirmed.

HUTCHINSON and RAPP, JJ., concur.